## MORISSETTE *v.* UNITED STATES.

No. 12. Argued October 9–10, 1951.—Decided January 7, 1952.

*Andrew J. Transue* argued the cause and filed a brief for petitioner.

*Robert W. Ginnane* argued the cause for the United States. With him on the brief were *Solicitor General Perlman, Assistant Attorney General McInerney* and *J. F. Bishop.*

Mr. Justice Jackson delivered the opinion of the Court.

This would have remained a profoundly insignificant case to all except its immediate parties had it not been so tried and submitted to the jury as to raise questions both fundamental and far-reaching in federal criminal law, for which reason we granted certiorari.[1]

On a large tract of uninhabited and untilled land in a wooded and sparsely populated area of Michigan, the Government established a practice bombing range over which the Air Force dropped simulated bombs at ground targets. These bombs consisted of a metal cylinder about forty inches long and eight inches across, filled with sand and enough black powder to cause a smoke puff by which the strike could be located. At various places about the range signs read "Danger—Keep Out—Bombing Range." Nevertheless, the range was known as good deer country and was extensively hunted.

Spent bomb casings were cleared from the targets and thrown into piles "so that they will be out of the way." They were not stacked or piled in any order but were dumped in heaps, some of which had been accumulating for four years or upwards, were exposed to the weather and rusting away.

Morissette, in December of 1948, went hunting in this area but did not get a deer. He thought to meet expenses of the trip by salvaging some of these casings. He loaded three tons of them on his truck and took them to a nearby farm, where they were flattened by driving a tractor over them. After expending this labor and trucking them to market in Flint, he realized $84.

Morissette, by occupation, is a fruit stand operator in summer and a trucker and scrap iron collector in winter. An honorably discharged veteran of World War II,

[1] 341 U. S. 925.

he enjoys a good name among his neighbors and has had no blemish on his record more disreputable than a conviction for reckless driving.

The loading, crushing and transporting of these casings were all in broad daylight, in full view of passers-by, without the slightest effort at concealment. When an investigation was started, Morissette voluntarily, promptly and candidly told the whole story to the authorities, saying that he had no intention of stealing but thought the property was abandoned, unwanted and considered of no value to the Government. He was indicted, however, on the charge that he "did unlawfully, wilfully and knowingly steal and convert" property of the United States of the value of $84, in violation of 18 U. S. C. § 641, which provides that "whoever embezzles, steals, purloins, or knowingly converts" government property is punishable by fine and imprisonment.[2] Morissette was convicted and sentenced to imprisonment for two months or to pay a fine of $200. The Court of Appeals affirmed, one judge dissenting.[3]

On his trial, Morissette, as he had at all times told investigating officers, testified that from appearances he believed the casings were cast-off and abandoned, that he did not intend to steal the property, and took it with no

---

[2] 18 U. S. C. § 641, so far as pertinent, reads:

"Whoever embezzles, steals, purloins, or knowingly converts to his use or the use of another, or without authority, sells, conveys or disposes of any record, voucher, money, or thing of value of the United States or of any department or agency thereof, or any property made or being made under contract for the United States or any department or agency thereof;

. . .

"Shall be fined not more than $10,000 or imprisoned not more than ten years, or both; but if the value of such property does not exceed the sum of $100, he shall be fined not more than $1,000 or imprisoned not more than one year, or both."

[3] Morissette v. United States, 187 F. 2d 427.

wrongful or criminal intent. The trial court, however, was unimpressed, and ruled: "[H]e took it because he thought it was abandoned and he knew he was on government property. . . . That is no defense. . . . I don't think anybody can have the defense they thought the property was abandoned on another man's piece of property." The court stated: "I will not permit you to show this man thought it was abandoned. . . . I hold in this case that there is no question of abandoned property." The court refused to submit or to allow counsel to argue to the jury whether Morissette acted with innocent intention. It charged: "And I instruct you that if you believe the testimony of the government in this case, he intended to take it. . . . He had no right to take this property. . . . [A]nd it is no defense to claim that it was abandoned, because it was on private property. . . . And I instruct you to this effect: That if this young man took this property (and he says he did), without any permission (he says he did), that was on the property of the United States Government (he says it was), that it was of the value of one cent or more (and evidently it was), that he is guilty of the offense charged here. If you believe the government, he is guilty. . . . The question on intent is whether or not he intended to take the property. He says he did. Therefore, if you believe either side, he is guilty." Petitioner's counsel contended, "But the taking must have been with a felonious intent." The court ruled, however: "That is presumed by his own act."

The Court of Appeals suggested that "greater restraint in expression should have been exercised," but affirmed the conviction because, "As we have interpreted the statute, appellant was guilty of its violation beyond a shadow of doubt, as evidenced even by his own admissions." Its construction of the statute is that it creates several separate and distinct offenses, one being knowing

conversion of government property. The court ruled that this particular offense requires no element of criminal intent. This conclusion was thought to be required by the failure of Congress to express such a requisite and this Court's decisions in *United States* v. *Behrman,* 258 U.S. 280, and *United States* v. *Balint,* 258 U. S. 250.

## I.

In those cases this Court did construe mere omission from a criminal enactment of any mention of criminal intent as dispensing with it. If they be deemed precedents for principles of construction generally applicable to federal penal statutes, they authorize this conviction. Indeed, such adoption of the literal reasoning announced in those cases would do this and more—it would sweep out of all federal crimes, except when expressly preserved, the ancient requirement of a culpable state of mind. We think a résumé of their historical background is convincing that an effect has been ascribed to them more comprehensive than was contemplated and one inconsistent with our philosophy of criminal law.

The contention that an injury can amount to a crime only when inflicted by intention is no provincial or transient notion. It is as universal and persistent in mature systems of law as belief in freedom of the human will and a consequent ability and duty of the normal individual to choose between good and evil.[4] A relation between some mental element and punishment for a

---

[4] For a brief history and philosophy of this concept in Biblical, Greek, Roman, Continental and Anglo-American law, see Radin, Intent, Criminal, 8 Encyc. Soc. Sci. 126. For more extensive treatment of the development in English Law, see 2 Pollock and Maitland, History of English Law, 448–511. "Historically, our substantive criminal law is based upon a theory of punishing the vicious will. It postulates a free agent confronted with a choice between doing right and doing wrong and choosing freely to do wrong." Pound, Introduction to Sayre, Cases on Criminal Law (1927).

harmful act is almost as instinctive as the child's familiar exculpatory "But I didn't mean to," and has afforded the rational basis for a tardy and unfinished substitution of deterrence and reformation in place of retaliation and vengeance as the motivation for public prosecution.[5] Unqualified acceptance of this doctrine by English common law in the Eighteenth Century was indicated by Blackstone's sweeping statement that to constitute any crime there must first be a "vicious will."[6] Common-law commentators of the Nineteenth Century early pronounced the same principle,[7] although a few exceptions not relevant to our present problem came to be recognized.[8]

Crime, as a compound concept, generally constituted only from concurrence of an evil-meaning mind with an evil-doing hand, was congenial to an intense individu-

---

[5] In *Williams* v. *New York*, 337 U. S. 241, 248, we observed that "Retribution is no longer the dominant objective of the criminal law. Reformation and rehabilitation of offenders have become important goals of criminal jurisprudence." We also there referred to ". . . a prevalent modern philosophy of penology that the punishment should fit the offender and not merely the crime." *Id.*, at 247. Such ends would seem illusory if there were no mental element in crime.

[6] 4 Bl. Comm. 21.

[7] Examples of these texts and their alterations in successive editions in consequence of evolution in the law of "public welfare offenses," as hereinafter recited, are traced in Sayre, Public Welfare Offenses, 33 Col. L. Rev. 55, 66.

[8] Exceptions came to include sex offenses, such as rape, in which the victim's actual age was determinative despite defendant's reasonable belief that the girl had reached age of consent. Absence of intent also involves such considerations as lack of understanding because of insanity, subnormal mentality, or infancy, lack of volition due to some actual compulsion, or that inferred from doctrines of coverture. Most extensive inroads upon the requirement of intention, however, are offenses of negligence, such as involuntary manslaughter or criminal negligence and the whole range of crimes arising from omission of duty. Cf. *Commonwealth* v. *Welansky*, 316 Mass. 383, 55 N. E. 2d 902 (1944).

alism and took deep and early root in American soil.[9] As the states codified the common law of crimes, even if their enactments were silent on the subject, their courts assumed that the omission did not signify disapproval of the principle but merely recognized that intent was so inherent in the idea of the offense that it required no statutory affirmation. Courts, with little hesitation or division, found an implication of the requirement as to offenses that were taken over from the common law.[10] The unanimity with which they have adhered to the central thought that wrongdoing must be conscious to be criminal is emphasized by the variety, disparity and confusion of their definitions of the requisite but elusive mental element. However, courts of various jurisdictions, and for the purposes of different offenses, have devised working formulae, if not scientific ones, for the instruction of juries around such terms as "felonious intent," "criminal intent," "malice aforethought," "guilty knowledge," "fraudulent intent," "wilfulness," "*scienter*," to denote guilty knowledge, or "*mens rea*," to signify an evil purpose or mental culpability. By use or combination of these various tokens, they have sought to protect those who were not blameworthy in mind from conviction of infamous common-law crimes.

However, the *Balint* and *Behrman* offenses belong to a category of another character, with very different antecedents and origins. The crimes there involved depend

---

[9] Holmes, The Common Law, considers intent in the chapter on The Criminal Law, and earlier makes the pithy observation: "Even a dog distinguishes between being stumbled over and being kicked." P. 3. Radin, Intent, Criminal, 8 Encyc. Soc. Sci. 126, 127, points out that in American law "*mens rea* is not so readily constituted from any wrongful act" as elsewhere.

[10] In the *Balint* case, Chief Justice Taft recognized this but rather overstated it by making no allowance for exceptions such as those mentioned in n. 8.

on no mental element but consist only of forbidden acts or omissions. This, while not expressed by the Court, is made clear from examination of a century-old but accelerating tendency, discernible both here [11] and in England,[12] to call into existence new duties and crimes which disregard any ingredient of intent. The industrial revolution

[11] This trend and its causes, advantages and dangers have been considered by Sayre, Public Welfare Offenses, 33 Col. L. Rev. 55; Hall, Prolegomena to a Science of Criminal Law, 89 U. of Pa. L. Rev. 549; Hall, Interrelations of Criminal Law and Torts, 43 Col. L. Rev. 753, 967.

[12] The changes in English law are illustrated by Nineteenth Century English cases. In 1814, it was held that one could not be convicted of selling impure foods unless he was aware of the impurities. *Rex* v. *Dixon,* 3 M. & S. 11 (K. B. 1814). However, thirty-two years later, in an action to enforce a statutory forfeiture for possession of adulterated tobacco, the respondent was held liable even though he had no knowledge of, or cause to suspect, the adulteration. Countering respondent's arguments, Baron Parke said, "It is very true that in particular instances it may produce mischief, because an innocent man may suffer from his want of care in not examining the tobacco he has received, and not taking a warranty; but the public inconvenience would be much greater, if in every case the officers were obliged to prove knowledge. They would be very seldom able to do so." *Regina* v. *Woodrow,* 15 M. & W. 404, 417 (Exch. 1846). Convenience of the prosecution thus emerged as a rationale. In 1866, a quarry owner was held liable for the nuisance caused by his workmen dumping refuse into a river, in spite of his plea that he played no active part in the management of the business and knew nothing about the dumping involved. His knowledge or lack of it was deemed irrelevant. *Regina* v. *Stephens,* L. R. 1 Q. B. 702 (1866). Bishop, referring to this decision, says, "The doctrine of this English case may almost be deemed new in the criminal law . . . . And, properly limited, the doctrine is eminently worthy to be followed hereafter." 1 Bishop, New Criminal Law (8th ed. 1892), § 1076. After these decisions, statutes prohibiting the sale of impure or adulterated food were enacted. Adulteration of Food Act (35 & 36 Vict., c. 74, § 2 (1872)); Sale of Food and Drugs Act of 1875 (38 & 39 Vict., c. 63). A conviction under the former was sustained in a holding that no guilty knowledge or intent need be

multiplied the number of workmen exposed to injury from increasingly powerful and complex mechanisms, driven by freshly discovered sources of energy, requiring higher precautions by employers. Traffic of velocities, volumes and varieties unheard of came to subject the wayfarer to intolerable casualty risks if owners and drivers were not to observe new cares and uniformities of conduct. Congestion of cities and crowding of quarters called for health and welfare regulations undreamed of in simpler times. Wide distribution of goods became an instrument of wide distribution of harm when those who dispersed food, drink, drugs, and even securities, did not comply with reasonable standards of quality, integrity, disclosure and care. Such dangers have engendered increasingly numerous and detailed regulations which heighten the duties of those in control of particular industries, trades, properties or activities that affect public health, safety or welfare.

While many of these duties are sanctioned by a more strict civil liability,[13] lawmakers, whether wisely or not,[14]

---

proved in a prosecution for the sale of adulterated butter, *Fitzpatrick* v. *Kelly,* L. R. 8 Q. B. 337 (1873), and in *Betts* v. *Armstead,* L. R. 20 Q. B. D. 771 (1888), involving the latter statute, it was held that there was no need for a showing that the accused had knowledge that his product did not measure up to the statutory specifications.

[13] The development of strict criminal liability regardless of intent has been roughly paralleled by an evolution of a strict civil liability for consequences regardless of fault in certain relationships, as shown by Workmen's Compensation Acts, and by vicarious liability for fault of others as evidenced by various Motor Vehicle Acts.

[14] Consequences of a general abolition of intent as an ingredient of serious crimes have aroused the concern of responsible and disinterested students of penology. Of course, they would not justify judicial disregard of a clear command to that effect from Congress, but they do admonish us to caution in assuming that Congress, without clear expression, intends in any instance to do so.

Radin, Intent, Criminal, 8 Encyc. Soc. Sci. 126, 130, says, ". . . as long as in popular belief intention and the freedom of the will are

have sought to make such regulations more effective by invoking criminal sanctions to be applied by the familiar technique of criminal prosecutions and convictions. This has confronted the courts with a multitude of prosecutions, based on statutes or administrative regulations, for what have been aptly called "public welfare offenses." These cases do not fit neatly into any of such accepted classifications of common-law offenses, such as those against the state, the person, property, or public morals. Many of these offenses are not in the nature of positive aggressions or invasions, with which the common law so often dealt, but are in the nature of neglect where the law requires care, or inaction where it imposes a duty. Many

---

taken as axiomatic, no penal system that negates the mental element can find general acceptance. It is vital to retain public support of methods of dealing with crime." Again, "The question of criminal intent will probably always have something of an academic taint. Nevertheless, the fact remains that the determination of the boundary between intent and negligence spells freedom or condemnation for thousands of individuals. The watchfulness of the jurist justifies itself at present in its insistence upon the examination of the mind of each individual offender."

Sayre, Public Welfare Offenses, 33 Col. L. Rev. 55, 56, says: "To inflict substantial punishment upon one who is morally entirely innocent, who caused injury through reasonable mistake or pure accident, would so outrage the feelings of the community as to nullify its own enforcement."

Hall, Prolegomena to a Science of Criminal Law, 89 U. of Pa. L. Rev. 549, 569, appears somewhat less disturbed by the trend, if properly limited, but, as to so-called public welfare crimes, suggests that "There is no reason to continue to believe that the present mode of dealing with these offenses is the best solution obtainable, or that we must be content with this sacrifice of established principles. *The raising of a presumption of knowledge might be an improvement.*" (Italics added.)

In *Felton v. United States*, 96 U. S. 699, 703, the Court said, "But the law at the same time is not so unreasonable as to attach culpability, and consequently to impose punishment, where there is no intention to evade its provisions . . . ."

violations of such regulations result in no direct or immediate injury to person or property but merely create the danger or probability of it which the law seeks to minimize. While such offenses do not threaten the security of the state in the manner of treason, they may be regarded as offenses against its authority, for their occurrence impairs the efficiency of controls deemed essential to the social order as presently constituted. In this respect, whatever the intent of the violator, the injury is the same, and the consequences are injurious or not according to fortuity. Hence, legislation applicable to such offenses, as a matter of policy, does not specify intent as a necessary element. The accused, if he does not will the violation, usually is in a position to prevent it with no more care than society might reasonably expect and no more exertion than it might reasonably exact from one who assumed his responsibilities. Also, penalties commonly are relatively small, and conviction does no grave damage to an offender's reputation. Under such considerations, courts have turned to construing statutes and regulations which make no mention of intent as dispensing with it and holding that the guilty act alone makes out the crime. This has not, however, been without expressions of misgiving.

The pilot of the movement in this country appears to be a holding that a tavernkeeper could be convicted for selling liquor to an habitual drunkard even if he did not know the buyer to be such. *Barnes* v. *State,* 19 Conn. 398 (1849). Later came Massachusetts holdings that convictions for selling adulterated milk in violation of statutes forbidding such sales require no allegation or proof that defendant knew of the adulteration. *Commonwealth* v. *Farren,* 9 Allen 489 (1864); *Commonwealth* v. *Nichols,* 10 Allen 199 (1865); *Commonwealth* v. *Waite,* 11 Allen 264 (1865). Departures from the common-law tradition,

mainly of these general classes, were reviewed and their rationale appraised by Chief Justice Cooley, as follows:

> "I agree that as a rule there can be no crime without a criminal intent; but this is not by any means a universal rule. . . . Many statutes which are in the nature of police regulations, as this is, impose criminal penalties irrespective of any intent to violate them; the purpose being to require a degree of diligence for the protection of the public which shall render violation impossible." *People* v. *Roby,* 52 Mich. 577, 579, 18 N. W. 365, 366 (1884).

After the turn of the Century, a new use for crimes without intent appeared when New York enacted numerous and novel regulations of tenement houses, sanctioned by money penalties. Landlords contended that a guilty intent was essential to establish a violation. Judge Cardozo wrote the answer:

> "The defendant asks us to test the meaning of this statute by standards applicable to statutes that govern infamous crimes. The analogy, however, is deceptive. The element of conscious wrongdoing, the guilty mind accompanying the guilty act, is associated with the concept of crimes that are punished as infamous. . . . Even there it is not an invariable element. . . . But in the prosecution of minor offenses, there is a wider range of practice and of power. Prosecutions for petty penalties have always constituted in our law a class by themselves. . . . That is true though the prosecution is criminal in form." *Tenement House Department* v. *McDevitt,* 215 N. Y. 160, 168, 109 N. E. 88, 90 (1915).

Soon, employers advanced the same contention as to violations of regulations prescribed by a new labor law. Judge Cardozo, again for the court, pointed out, as a basis

for penalizing violations whether intentional or not, that they were punishable only by fine "moderate in amount," but cautiously added that in sustaining the power so to fine unintended violations "we are not to be understood as sustaining to a like length the power to imprison. We leave that question open." *People ex rel. Price* v. *Sheffield Farms Co.*, 225 N. Y. 25, 32–33, 121 N. E. 474, 477 (1918).

Thus, for diverse but reconcilable reasons, state courts converged on the same result, discontinuing inquiry into intent in a limited class of offenses against such statutory regulations.

Before long, similar questions growing out of federal legislation reached this Court. Its judgments were in harmony with this consensus of state judicial opinion, the existence of which may have led the Court to overlook the need for full exposition of their rationale in the context of federal law. In overruling a contention that there can be no conviction on an indictment which makes no charge of criminal intent but alleges only making of a sale of a narcotic forbidden by law, Chief Justice Taft, wrote:

> "While the general rule at common law was that the *scienter* was a necessary element in the indictment and proof of every crime, and this was followed in regard to statutory crimes even where the statutory definition did not in terms include it . . . , there has been a modification of this view in respect to prosecutions under statutes the purpose of which would be obstructed by such a requirement. It is a question of legislative intent to be construed by the court. . . ." *United States* v. *Balint, supra,* 251–252.

He referred, however, to "regulatory measures in the exercise of what is called the police power where the em-

phasis of the statute is evidently upon achievement of some social betterment rather than the punishment of the crimes as in cases of *mala in se*," and drew his citation of supporting authority chiefly from state court cases dealing with regulatory offenses. *Id.*, at 252.

On the same day, the Court determined that an offense under the Narcotic Drug Act does not require intent, saying, "If the offense be a statutory one, and intent or knowledge is not made an element of it, the indictment need not charge such knowledge or intent." *United States* v. *Behrman, supra,* at 288.

Of course, the purpose of every statute would be "obstructed" by requiring a finding of intent, if we assume that it had a purpose to convict without it. Therefore, the obstruction rationale does not help us to learn the purpose of the omission by Congress. And since no federal crime can exist except by force of statute, the reasoning of the *Behrman* opinion, if read literally, would work far-reaching changes in the composition of all federal crimes. Had such a result been contemplated, it could hardly have escaped mention by a Court which numbered among its members one especially interested and informed concerning the importance of intent in common-law crimes.[15] This might be the more expected since the *Behrman* holding did call forth his dissent, in which Mr. Justice McReynolds and Mr. Justice Brandeis joined, omitting any such mention.

It was not until recently that the Court took occasion more explicitly to relate abandonment of the ingredient of intent, not merely with considerations of expediency in obtaining convictions, nor with the *malum prohibitum* classification of the crime, but with the peculiar nature and quality of the offense. We referred to ". . . a now familiar type of legislation whereby penalties serve as

---

[15] Holmes, The Common Law.

effective means of regulation," and continued, "such legis-
lation dispenses with the conventional requirement for
criminal conduct—awareness of some wrongdoing. In
the interest of the larger good it puts the burden of act-
ing at hazard upon a person otherwise innocent but stand-
ing in responsible relation to a public danger." But
we warned: "Hardship there doubtless may be under a
statute which thus penalizes the transaction though con-
sciousness of wrongdoing be totally wanting." *United
States* v. *Dotterweich,* 320 U. S. 277, 280–281, 284.[16]

Neither this Court nor, so far as we are aware, any
other has undertaken to delineate a precise line or set
forth comprehensive criteria for distinguishing between
crimes that require a mental element and crimes that do
not. We attempt no closed definition; for the law on the
subject is neither settled nor static. The conclusion
reached in the *Balint* and *Behrman* cases has our approval
and adherence for the circumstances to which it was there
applied. A quite different question here is whether we
will expand the doctrine of crimes without intent to in-
clude those charged here.

Stealing, larceny, and its variants and equivalents, were
among the earliest offenses known to the law that existed
before legislation; [17] they are invasions of rights of prop-
erty which stir a sense of insecurity in the whole com-
munity and arouse public demand for retribution, the
penalty is high and, when a sufficient amount is involved,
the infamy is that of a felony, which, says Maitland, is
". . . as bad a word as you can give to man or thing." [18]
State courts of last resort, on whom fall the heaviest bur-

---

[16] For the place of the mental element in offenses against the rev-
enues, see *Spies* v. *United States,* 317 U. S. 492; *United States* v.
*Scharton,* 285 U. S. 518.

[17] 2 Russell on Crime (10th ed., Turner, 1950) 1037.

[18] 2 Pollock and Maitland, History of English Law, 465.

den of interpreting criminal law in this country, have consistently retained the requirement of intent in larceny-type offenses.[19]  If any state has deviated, the exception has neither been called to our attention nor disclosed by our research.

Congress, therefore, omitted any express prescription of criminal intent from the enactment before us in the light of an unbroken course of judicial decision in all

[19] Examples of decision in diverse jurisdictions may be culled from any digest.  Most nearly in point are *Johnson* v. *State*, 36 Tex. 375, holding that to take a horse running at large on the range is not larceny in the absence of an intent to deprive an owner of his property; *Jordan* v. *State*, 107 Tex. Cr. R. 414, 296 S. W. 585, that, if at the time of taking parts from an automobile the accused believed that the car had been abandoned by its owner, he should be acquitted; *Fetkenhauer* v. *State*, 112 Wis. 491, 88 N. W. 294, that an honest, although mistaken, belief by defendant that he had permission to take property should be considered by the jury; and *Devine* v. *People*, 20 Hun (N. Y.) 98, holding that a claim that an act was only a practical joke must be weighed against an admitted taking of property.

Others of like purport are *Farzley* v. *State*, 231 Ala. 60, 163 So. 394; *Nickerson* v. *State*, 22 Ala. App. 640, 119 So. 243; *People* v. *Williams*, 73 Cal. App. 2d 154, 166 P. 2d 63; *Schiff* v. *People*, 111 Colo. 333, 141 P. 2d 892; *Kemp* v. *State*, 146 Fla. 101, 200 So. 368; *Perdew* v. *Commonwealth*, 260 Ky. 638, 86 S. W. 2d 534, holding that appropriation by a finder of lost property cannot constitute larceny in the absence of intent; *People* v. *Shaunding*, 268 Mich. 218, 255 N. W. 770; *People* v. *Will*, 289 N. Y. 413, 46 N. E. 2d 498; *Van Vechten* v. *American Eagle Fire Ins. Co.*, 239 N. Y. 303, 146 N. E. 432; *Thomas* v. *Kessler*, 334 Pa. 7, 5 A. 2d 187; *Barnes* v. *State*, 145 Tex. Cr. R. 131, 166 S. W. 2d 708; *Sandel* v. *State*, 131 Tex. Cr. R. 132, 97 S. W. 2d 225; *Weeks* v. *State*, 114 Tex. Cr. R. 406, 25 S. W. 2d 855; *Heskew* v. *State*, 18 Tex. Ct. App. 275; *Page* v. *Commonwealth*, 148 Va. 733, 138 S. E. 510, holding reversible error to exclude evidence having a tendency to throw light on the question of the bona fides of one accused of larceny; *Butts* v. *Commonwealth*, 145 Va. 800, 133 S. E. 764; *State* v. *Levy*, 113 Vt. 459, 35 A. 2d 853, holding that the taking of another's property in good faith by inadvertence or mistake does not constitute larceny.

constituent states of the Union holding intent inherent in this class of offense, even when not expressed in a statute. Congressional silence as to mental elements in an Act merely adopting into federal statutory law a concept of crime already so well defined in common law and statutory interpretation by the states may warrant quite contrary inferences than the same silence in creating an offense new to general law, for whose definition the courts have no guidance except the Act. Because the offenses before this Court in the *Balint* and *Behrman* cases were of this latter class, we cannot accept them as authority for eliminating intent from offenses incorporated from the common law. Nor do exhaustive studies of state court cases disclose any well-considered decisions applying the doctrine of crime without intent to such enacted common-law offenses,[20] although a few deviations are notable as illustrative of the danger inherent in the Government's contentions here.[21]

---

[20] Sayre, Public Welfare Offenses, 33 Col. L. Rev. 55, 73, 84, cites and classifies a large number of cases and concludes that they fall roughly into subdivisions of (1) illegal sales of intoxicating liquor, (2) sales of impure or adulterated food or drugs, (3) sales of misbranded articles, (4) violations of antinarcotic Acts, (5) criminal nuisances, (6) violations of traffic regulations, (7) violations of motor-vehicle laws, and (8) violations of general police regulations, passed for the safety, health or well-being of the community.

[21] Sayre points out that in criminal syndicalism or sedition cases, where the pressure to convict is strong, it has been accomplished by dispensing with the element of intent, in some instances by analogy with the public welfare offense. Examples are *State* v. *Hennessy*, 114 Wash. 351, 195 P. 211; *People* v. *Ruthenberg*, 229 Mich. 315, 201 N. W. 358; *State* v. *Kahn*, 56 Mont. 108, 182 P. 107; *State* v. *Smith*, 57 Mont. 563, 190 P. 107. Compare *People* v. *McClennegen*, 195 Cal. 445, 234 P. 91. This although intent is of the very essence of offenses based on disloyalty. Cf. *Cramer* v. *United States*, 325 U. S. 1; *Haupt* v. *United States*, 330 U. S. 631, where innocence of intention will defeat a charge even of treason.

The Government asks us by a feat of construction radically to change the weights and balances in the scales of justice. The purpose and obvious effect of doing away with the requirement of a guilty intent is to ease the prosecution's path to conviction, to strip the defendant of such benefit as he derived at common law from innocence of evil purpose, and to circumscribe the freedom heretofore allowed juries. Such a manifest impairment of the immunities of the individual should not be extended to common-law crimes on judicial initiative.

The spirit of the doctrine which denies to the federal judiciary power to create crimes forthrightly [22] admonishes that we should not enlarge the reach of enacted crimes by constituting them from anything less than the incriminating components contemplated by the words used in the statute. And where Congress borrows terms of art in which are accumulated the legal tradition and meaning of centuries of practice, it presumably knows and adopts the cluster of ideas that were attached to each borrowed word in the body of learning from which it was taken and the meaning its use will convey to the judicial mind unless otherwise instructed. In such case, absence of contrary direction may be taken as satisfaction with widely accepted definitions, not as a departure from them.

We hold that mere omission from § 641 of any mention of intent will not be construed as eliminating that element from the crimes denounced.

## II.

It is suggested, however, that the history and purposes of § 641 imply something more affirmative as to elimination of intent from at least one of the offenses charged under it in this case. The argument does not contest

---

[22] *United States* v. *Hudson and Goodwin,* 7 Cranch 32; *United States* v. *Gooding,* 12 Wheat. 460.

that criminal intent is retained in the offenses of embezzlement, stealing and purloining, as incorporated into this section. But it is urged that Congress joined with those, as a new, separate and distinct offense, knowingly to convert government property, under circumstances which imply that it is an offense in which the mental element of intent is not necessary.

Congress has been alert to what often is a decisive function of some mental element in crime. It has seen fit to prescribe that an evil state of mind, described variously in one or more such terms as "intentional," "wilful," "knowing," "fraudulent" or "malicious," will make criminal an otherwise indifferent act,[23] or increase the degree of the offense or its punishment.[24] Also, it has

---

[23] 18 U. S. C. § 81, *Arson:* ". . . willfully and maliciously . . ."; 18 U. S. C. § 113, *Assault:* "(a) . . . with intent to commit murder or rape . . . . (b) . . . with intent to commit any felony, except murder or rape . . ."; 18 U. S. C. § 152, *Bankruptcy—concealment of assets, false oaths and claims, bribery:* ". . . knowingly and fraudulently . . ."; 18 U. S. C. § 201, *Bribery and Graft:* ". . . with intent to influence . . ."; 18 U. S. C. § 471, *Counterfeiting and Forgery:* ". . . with intent to defraud . . ."; 18 U. S. C. § 594, *Intimidation of voters:* ". . . for the purpose of . . ."; 18 U. S. C. § 1072, *Concealing escaped prisoner:* ". . . willfully . . ."; 61 Stat. 151, 29 U. S. C. § 162, *Interference with a member of the National Labor Relations Board or an agent of the Board in his performance of his duties:* ". . . willfully . . ."; 52 Stat. 1069, 29 U. S. C. § 216 (a), *Violations of provisions of Fair Labor Standards Act:* ". . . willfully . . ."; 37 Stat. 251, 21 U. S. C. § 23, *Packing or selling misbranded barrels of apples:* ". . . knowingly . . . ."

[24] 18 U. S. C. § 1112, Manslaughter, ". . . the unlawful killing of a human being without malice," if voluntary, carries a maximum penalty of imprisonment not to exceed ten years. If the killing is "with malice aforethought," the crime is murder, 18 U. S. C. § 1111, and, if of the first degree, punishable by death or life imprisonment, or, if of the second degree, punishable by imprisonment for any term of years or life.

at times required a specific intent or purpose which will require some specialized knowledge or design for some evil beyond the common-law intent to do injury.[25] The law under some circumstances recognizes good faith or blameless intent as a defense, partial defense, or as an element to be considered in mitigation of punishment.[26] And treason—the one crime deemed grave enough for definition in our Constitution itself—requires not only the duly witnessed overt act of aid and comfort to the enemy but also the mental element of disloyalty or adherence to the enemy.[27] In view of the care that has been bestowed upon the subject, it is significant that we have not found, nor has our attention been directed to, any instance in which Congress has expressly eliminated the mental element from a crime taken over from the common law.

The section with which we are here concerned was enacted in 1948, as a consolidation of four former sections of Title 18, as adopted in 1940, which in turn were derived from two sections of the Revised Statutes. The pertinent legislative and judicial history of these anteced-

---

[25] 18 U. S. C. § 242; *Screws* v. *United States,* 325 U. S. 91.

[26] I. R. C. §§ 145 (a), 145 (b), 53 Stat. 62, as amended, 26 U. S. C. §§ 145 (a), 145 (b), as construed in *Spies* v. *United States,* 317 U. S. 492; 52 Stat. 1069, 29 U. S. C. § 216 (a), stating the criminal sanctions for violations of the Fair Labor Standards Act, provides that: "No person shall be imprisoned under this subsection except for an offense committed after the conviction of such person for a prior offense under this subsection." N. Y. Penal Law, § 1306, provides that, "Upon an indictment for larceny it is a sufficient defense that the property was appropriated openly and avowedly, under a claim of title preferred in good faith, even though such claim is untenable."

[27] U. S. Const., Art. III, § 3, cl. 1.

This provision was to prevent incrimination of mere mental operations such as "compassing" the death of the King. See *Cramer* v. *United States,* 325 U. S. 1. To hold that a mental element is necessary to a crime is, of course, not to say that it is all that is necessary.

ents, as well as of § 641, is footnoted.[28]   We find no other purpose in the 1948 re-enactment than to collect from scattered sources crimes so ·kindred as to belong in

[28] The Reviser's Note to 18 U. S. C. § 641 states that it is derived from 18 U. S. C. (1940 ed.) §§ 82, 87, 100, and 101 which, in turn, are from Rev. Stat. §§ 5438 and 5439.   We shall consider only the 1940 code. sections and their interpretations.

18 U. S. C. (1940 ed.) § 82 reads:

"Whoever shall take and carry away or take for his use, or for the use of another, with· intent to steal or purloin . . . any property of the United States . . . shall be punished as follows . . . ."

In *United States* v. *Anderson*, 45 F. Supp. 943, a prosecution for conspiracy to violate that section, District Judge Yankwich said:

"It has been before the courts in very few cases.   But such courts as have had cases under it, including our own Ninth Circuit Court of Appeals, have held that the object of the section is to introduce the crime of larceny into the Federal Criminal Code.

"In Frach v. Mass, 9 Cir., 1939, 106 F. 2d 820, 821, we find these words: 'Larceny of property of the United States is made a crime by 18 U. S. C. A. § 82.'

"This means of course, that in interpreting the statute, we may apply the principles governing the common law crime of larceny, as interpreted by the courts of various states."   45 F. Supp. at 945.

*United States* v. *Trinder*, 1 F. Supp. 659, was a prosecution of a group of boys, under § 82, for "stealing" a government automobile.   They had taken it for.a joy ride without permission, fully intending to return it when they were through..   Their plans went awry when the .auto came to grief against a telephone pole.   In dismissing the complaint, the District Judge said:

, "Upon principle and authority there was no stealing but merely trespass; secret borrowing.   At common law and likewise by the federal statute (18 USCA § 82) adopting common-law terms, stealing in general imports larceny; that is, felonious taking and intent to permanently deprive the owner of his property."   1 F. Supp. at 660.

18 U. S. C. (1940 ed.) § 87, entitled "Embezzling arms and stores," provides:

"Whoever'shall steal, embezzle, or knowingly apply to his own use, or unlawfully sell, convey, or dispose of, any ordnance, arms, ammunition, clothing, subsistence, stores, money, or other property of the United States, furnished or to be used for the military or naval

one category. Not one of these had been interpreted to be a crime without intention and no purpose to differentiate between them in the matter of intent is disclosed.

service, shall be punished as prescribed in sections 80 and 82–86 of this title."

No cases appear to have been decided relating to the element of intent in the acts proscribed in that section.

18 U. S. C. (1940 ed.) § 100, "Embezzling public moneys or other property," states that:

"Whoever shall embezzle, steal, or purloin any money, property, record, voucher, or valuable thing whatever, of the moneys, goods, chattels, records, or property of the United States, shall be fined not more than $5,000, or imprisoned not more than five years, or both."

⌐ The only noted case of consequence is *Crabb* v. *Zerbst,* 99 F. 2d 562 (C. A. 5th Cir.), to which the dissent below referred at some length. The appellant there was convicted of feloniously taking and carrying away certain personal property of the United States in violation of § 46 of the Criminal Code, 18 U. S. C. (1940 ed.) § 99, and had been sentenced to seven years' imprisonment. He argued that the five-year limitation of sentence in 18 U. S. C. (1940 ed.) § 100 for stealing property of the United States reduced the ten-year limitation in § 99 for feloniously taking and carrying away property of the United States to five years also.

The Court of Appeals rejected his argument, holding that the crime of "stealing" in § 100 was separate and distinct from the offense specified in § 99, on the ground that § 100 was a broadening of the common-law crime of larceny to foreclose any avenue by which one might, in the process of pleading, escape conviction for one offense by proving that he had committed another only a hair's breadth different.

In the course of its opinion, it advanced the following pertinent observations:

"That felonious taking and carrying away of property which may be the subject of the offense constitutes the common law offense of larceny cannot be disputed. . . . However, it is doubtful if at common law any fixed definition or formula [as to the meaning of 'larceny'] was not strained in its application to some of the cases clearly constituting the offense. Modern criminal codes treat the offense in various ways. Some define the offense by following the old cases and are merely declaratory of the common law, while others

No inference that some were and some were not crimes of intention can be drawn from any difference in classification or punishment. Not one fits the congressional classification of the petty offense; each is, at its least, a misdemeanor, and if the amount involved is one hundred

---

have broadened the offense to include offenses previously known as embezzlement, false pretenses, and even felonious breaches of trust.

⁕ ⁕ ⁕ ⁕ ⁕

"As pointed out above, the modern tendency is to broaden the offense of larceny, by whatever name it may be called, to include such related offenses as would tend to complicate prosecutions under strict pleading and practice. In some of these statutes the offense is denominated 'theft' or 'stealing.' No statute offers a clearer example of compromise between the common law and the modern code than the two sections here involved. Section 46 [18 U. S. C. (1940 ed.) § 99] deals with robbery and larceny, the description of the latter being taken from the common law. Section 47 [18 U. S. C. (1940 ed.) § 100] denounces the related offenses which might be included with those described in section 46 under a code practice seeking to avoid the pitfalls of technical pleading. In it the offense of embezzlement is included by name, without definition. Then to cover such cases as may shade into larceny, as well as any new situation which may arise under changing modern conditions and not envisioned under the common law, it adds the words *steal or purloin* . . . . Stealing, having no common law definition to restrict its meaning as an offense, is commonly used to denote any dishonest transaction whereby one person obtains that which rightfully belongs to another, and deprives the owner of the rights and benefits of ownership, but may or may not involve the element of stealth usually attributed to the word *purloin*. . . . Thus, in any case involving larceny as defined by the common law, section 46 [18 U. S. C. (1940 ed.) § 99] would apply. Where the offense is embezzlement, or its nature so doubtful as to fall between larceny and embezzlement, it may be prosecuted under section 47 [18 U. S. C. (1940 ed.) § 100]." 99 F. 2d at 564–565.

The reference in *Crabb* v. *Zerbst* to 18 U. S. C. (1940 ed.) § 99, the robbery and larceny statute then operative, suggests examination of its successor in today's code. For purpose of clarification, that section states that:

"Whoever shall rob another of any kind or description of personal

or more dollars each is a felony.[29] If one crime without intent has been smuggled into a section whose dominant offenses do require intent, it was put in ill-fitting and compromising company. The Government apparently did not believe that conversion stood so alone when it

property belonging to the United States, or shall feloniously take and carry away the same, shall be fined not more than $5,000, or imprisoned not more than ten years, or both."

The Reviser's Note to 18 U. S. C. § 641 makes no mention of it as a successor to that section. The present robbery statute is 18 U. S. C. § 2112, "Personal property of United States," providing that:

"Whoever robs another of any kind or description of personal property belonging to the United States, shall be imprisoned not more than fifteen years."

The Reviser's Note to that section recites that it is derived from § 99 of the 1940 Code, and "That portion of said section 99 relating to felonious taking was omitted as covered by section 641 of this title," which makes it clear that, notwithstanding the absence of any reference to 18 U. S. C. (1940 ed.) § 99 in the Note to 18 U. S. C. § 641, the crime of larceny by a felonious taking and carrying away has been transported directly from the former into the latter.

18 U. S. C. (1940 ed.) § 101 is the forerunner of that part of present § 641 dealing with receiving stolen property, and has no application to the problem at hand.

The history of § 641 demonstrates that it was to apply to acts which constituted larceny or embezzlement at common law and also acts which shade into those crimes but which, most strictly considered, might not be found to fit their fixed definitions. It is also pertinent to note that it renders one subject to its penalty who "knowingly converts to his own use" property of the United States. The word "converts" does not appear in any of its predecessors. 18 U. S. C. (1940 ed.) § 82 is applicable to one who "take[s] for his [own] use . . . with intent to steal or purloin . . . ." 18 U. S. C. (1940 ed.) § 87 uses the words "knowingly apply to his own use." Neither 18 U. S. C. (1940 ed.) §§ 99, 100, nor 101 has any words resembling "knowingly converts to his own use." The 1948 Revision was not intended to create new crimes but to recodify those then in existence. We find no suggestion that a guilty intent was not a part of each crime now embodied in § 641.

[29] 18 U. S. C. §§ 1, 641.

drew this one-count indictment to charge that Morissette "did unlawfully, wilfully and knowingly steal and convert to his own use."[30]

Congress, by the language of this section, has been at pains to incriminate only "knowing" conversions. But, at common law, there are unwitting acts which constitute conversions. In the civil tort, except for recovery of exemplary damages, the defendant's knowledge, intent, motive, mistake, and good faith are generally irrelevant.[31] If one takes property which turns out to belong to another, his innocent intent will not shield him from making restitution or indemnity, for his well-meaning may not be allowed to deprive another of his own.

Had the statute applied to conversions without qualification, it would have made crimes of all unwitting, inadvertent and unintended conversions. Knowledge, of course, is not identical with intent and may not have been the most apt words of limitation. But knowing conver-

---

[30] Had the indictment been limited to a charge in the words of the statute, it would have been defective if, in the light of the common law, the statute itself failed to set forth expressly, fully, and clearly all elements necessary to constitute the offense. *United States* v. *Carll*, 105 U. S. 611.

[31] *Harker* v. *Dement*, 9 Gill (Md.) 7, 52 Am. Dec. 670 (1850); *Railroad Co.* v. *O'Donnell*, 49 Ohio St. 489, 32 N. E. 476 (1892). The rationale underlying such cases is that when one clearly assumes the rights of ownership over property of another no proof of intent to convert is necessary. It has even been held that one may be held liable in conversion even though he reasonably supposed that he had a legal right to the property in question. *Row* v. *Home Sav. Bank,* 306 Mass. 522, 29 N. E. 2d 552 (1940). For other cases in the same vein, see those collected in 53 Am. Jur. 852–854. These authorities leave no doubt that Morissette could be held liable for a civil conversion for his taking of the property here involved, and the instructions to the jury might have been appropriate in such a civil action. This assumes of course that actual abandonment was not proven, a matter which petitioner should be allowed to prove if he can.

sion requires more than knowledge that defendant was taking the property into his possession. He must have had knowledge of the facts, though not necessarily the law, that made the taking a conversion. In the case before us, whether the mental element that Congress required be spoken of as knowledge or as intent, would not seem to alter its bearing on guilt. For it is not apparent how Morissette could have knowingly or intentionally converted property that he did not know could be converted, as would be the case if it was in fact abandoned or if he truly believed it to be abandoned and unwanted property.

It is said, and at first blush the claim has plausibility, that, if we construe the statute to require a mental element as part of criminal conversion, it becomes a meaningless duplication of the offense of stealing, and that conversion can be given meaning only by interpreting it to disregard intention. But here again a broader view of the evolution of these crimes throws a different light on the legislation.

It is not surprising if there is considerable overlapping in the embezzlement, stealing, purloining and knowing conversion grouped in this statute. What has concerned codifiers of the larceny-type offense is that gaps or crevices have separated particular crimes of this general class and guilty men have escaped through the breaches. The books contain a surfeit of cases drawing fine distinctions between slightly different circumstances under which one may obtain wrongful advantages from another's property. The codifiers wanted to reach all such instances. Probably every stealing is a conversion, but certainly not every knowing conversion is a stealing. "To steal means to *take away from one* in lawful possession without right with the *intention to keep wrongfully*." (Italics added.) *Irving Trust Co.* v. *Leff,* 253 N. Y. 359, 364, 171 N. E. 569, 571. Conversion, however, may be consummated without

any intent to keep and without any wrongful taking, where the initial possession by the converter was entirely lawful. Conversion may include misuse or abuse of property. It may reach use in an unauthorized manner or to an unauthorized extent of property placed in one's custody for limited use. Money rightfully taken into one's custody may be converted without any intent to keep or embezzle it merely by commingling it with the custodian's own, if he was under a duty to keep it separate and intact. It is not difficult to think of intentional and knowing abuses and unauthorized uses of government property that might be knowing conversions but which could not be reached as embezzlement, stealing or purloining. Knowing conversion adds significantly to the range of protection of government property without interpreting it to punish unwitting conversions.

The purpose which we here attribute to Congress parallels that of codifiers of common law in England [32] and in the States [33] and demonstrates that the serious problem

---

[32] The Larceny Act of 1916, 6 & 7 Geo. V, c. 50, an Act "to consolidate and simplify the Law relating to Larceny triable on Indictment and Kindred Offences," provides:

"1. For the purposes of this Act—

"(1) A person steals who, without the consent of the owner, fraudulently and without a claim of right made in good faith, takes and carries away anything capable of being stolen with intent, at the time of such taking, permanently to deprive the owner thereof:

"Provided that a person may be guilty of stealing any such thing notwithstanding that he has lawful possession thereof, if, being a bailee or part owner thereof, he fraudulently converts the same to his own use or the use of any person other than the owner . . . ."

For the growth and development of the crime of larceny in England, see 2 Russell on Crime (10th ed., Turner, 1950), 1037–1222, from which the material above was taken.

[33] N. Y. Penal Law, § 1290, defines larceny as follows:

"A person who, with the intent to deprive or defraud another of the use and benefit of property or to appropriate the same to the use

lem in drafting such a statute is to avoid gaps and loopholes between offenses. It is significant that the English and State codifiers have tried to cover the same type of conduct that we are suggesting as the purpose of Congress here, without, however, departing from the common-law tradition that these are crimes of intendment.

We find no grounds for inferring any affirmative instruction from Congress to eliminate intent from any offense with which this defendant was charged.

## III.

As we read the record, this case was tried on the theory that even if criminal intent were essential its presence (a) should be decided by the court (b) as a presumption

of the taker, or of any other person other than the true owner, wrongfully takes, obtains or withholds, by any means whatever, from the possession of the true owner or of any other person any money, personal property, thing in action, evidence of debt or contract, or article of value of any kind, steals such property and is guilty of larceny."

The same section provides further that it shall be no defense to a prosecution that:

"2. The accused in the first instance obtained possession of, or title to, such property lawfully, provided he subsequently wrongfully withheld or appropriated such property to his own use or the use of any person not entitled to the use and benefit of such property . . . ."

The Historical Note to that section discloses that it represents an attempt to abolish the distinctions between kinds of larcenies. Laws 1942, c. 732, § 1, provided:

"It is hereby declared as the public policy of the state that the best interests of the people of the state will be served, and confusion and injustice avoided, by eliminating and abolishing the distinctions which have hitherto differentiated one sort of theft from another, each of which, under section twelve hundred and ninety of the penal law, was denominated a larceny, to wit: common law larceny by asportation, common law larceny by trick and device, obtaining property by false pretenses, and embezzlement."

of law, apparently conclusive, (c) predicated upon the isolated act of taking rather than upon all of the circumstances. In each of these respects we believe the trial court was in error.

Where intent of the accused is an ingredient of the crime charged, its existence is a question of fact which must be submitted to the jury. State court authorities cited to the effect that intent is relevant in larcenous crimes are equally emphatic and uniform that it is a jury issue. The settled practice and its reason are well stated by Judge Andrews in *People* v. *Flack,* 125 N. Y. 324, 334, 26 N. E. 267, 270:

> "It is alike the general rule of law and the dictate of natural justice that to constitute guilt there must be not only a wrongful act, but a criminal intention. Under our system (unless in exceptional cases), both must be found by the jury to justify a conviction for crime. However clear the proof may be, or however incontrovertible may seem to the judge to be the inference of a criminal intention, the question of intent can never be ruled as a question of law, but must always be submitted to the jury. Jurors may be perverse; the ends of justice may be defeated by unrighteous verdicts, but so long as the functions of the judge and jury are distinct, the one responding to the law, the other to the facts, neither can invade the province of the other without destroying the significance of trial by court and jury. . . ."

It follows that the trial court may not withdraw or prejudge the issue by instruction that the law raises a presumption of intent from an act. It often is tempting to cast in terms of a "presumption" a conclusion which a court thinks probable from given facts. The Supreme Court of Florida, for example, in a larceny case, from selected circumstances which are present in this case has

declared a presumption of exactly opposite effect from the one announced by the trial court here:

> ". . . But where the taking is open and there is no subsequent attempt to conceal the property, and no denial, but an avowal, of the taking a strong presumption arises that there was no felonious intent, which must be repelled by clear and convincing evidence before a conviction is authorized. . . ." *Kemp* v. *State,* 146 Fla. 101, 104, 200 So. 368, 369.

We think presumptive intent has no place in this case. A conclusive presumption which testimony could not overthrow would effectively eliminate intent as an ingredient of the offense. A presumption which would permit but not require the jury to assume intent from an isolated fact would prejudge a conclusion which the jury should reach of its own volition. A presumption which would permit the jury to make an assumption which all the evidence considered together does not logically establish would give to a proven fact an artificial and fictional effect.[34] In either case, this presumption would conflict with the overriding presumption of innocence with which the law endows the accused and which extends to every element of the crime. Such incriminating presumptions are not to be improvised by the judiciary. Even congressional power to facilitate convictions by substituting presumptions for proof is not without limit. *Tot* v. *United States,* 319 U. S. 463.

Moreover, the conclusion supplied by presumption in this instance was one of intent to steal the casings, and it was based on the mere fact that defendant took them. The court thought the only question was, "Did he intend

---

[34] Cf. Morgan, Instructing the Jury Upon Presumptions and Burden of Proof, 47 Harv. L. Rev. 59; Morgan, Some Observations Concerning Presumption, 44 Harv. L. Rev. 906.

to take the property?" That the removal of them was a conscious and intentional act was admitted. But that isolated fact is not an adequate basis on which the jury should find the criminal intent to steal or knowingly convert, that is, *wrongfully* to deprive another of possession of property. Whether that intent existed, the jury must determine, not only from the act of taking, but from that together with defendant's testimony and all of the surrounding circumstances.

Of course, the jury, considering Morissette's awareness that these casings were on government property, his failure to seek any permission for their removal and his self-interest as a witness, might have disbelieved his profession of innocent intent and concluded that his assertion of a belief that the casings were abandoned was an afterthought. Had the jury convicted on proper instructions it would be the end of the matter. But juries are not bound by what seems inescapable logic to judges. They might have concluded that the heaps of spent casings left in the hinterland to rust away presented an appearance of unwanted and abandoned junk, and that lack of any conscious deprivation of property or intentional injury was indicated by Morissette's good character, the openness of the taking, crushing and transporting of the casings, and the candor with which it was all admitted. They might have refused to brand Morissette as a thief. Had they done so, that too would have been the end of the matter.

*Reversed.*

Mr. Justice Douglas concurs in the result.

Mr. Justice Minton took no part in the consideration or decision of this case.