THE STATE OF OHIO *v.* GASTOWN, INC.

[Cite as State v. Gastown (1975), 49 Ohio Misc. 29.]

(No. CR 316—Decided September 10, 1975.)

Perrysburg Municipal Court.

Mr. *Chester H. Marcin,* prosecuting attorney, for plaintiff.

Mr. *Russell J. Glorioso* and Mr. *Joseph M. Carmosino,* for defendant.

SPORE, J. Defendant, Gastown, Inc., is charged with polluting a public waterway in violation of R. C. 1531.29.

The cause has been submitted to the court for determination upon the stipulated facts filed herein and without a hearing on the merits.

Basically, the facts are that Gastown is the owner and lessor of a gasoline service station located near Exit 5 of the Ohio Turnpike in Stony Ridge, Ohio. The station was at the time of the alleged offense leased to a dealer, William Bedinger, who was in possession of the premises and operated the business known as Gastown Truck Stop 5 under a dealer sales contract entered into between defendant and Bedinger on December 30, 1968. The station is one of a number of service stations in the vicinity of Exit 5. Around April 27, 1974, oil spillage entered Crane Creek, a

nearby public waterway, and agents of the State Wildlife Division and the Ohio Environmental Protection Agency embarked upon an investigation of the cause of the pollution of the creek. During the course of the inquiry, the assistant manager of the station was confronted by the state agents and requested to check the station's oil inventory and equipment. On April 28, 1974, the agents determined that some of the offending oil discharges emanated from a Gastown outfall pipe. No preventative action having been taken by the station operator, the agents, on April 29, 1974, contacted the defendant's manager for engineering at Cleveland, Ohio, and later that day a meeting was held between defendant's engineering manager and the Coast Guard to discuss the oil spillage problem. Within six hours of that meeting, defendant had set up oil reclamation operations on Crane Creek. On the same day it discovered and repaired the underground coupling at the station which was the source of the oil loss. The total cost of the reclamation project was $5,591.20, all of which was borne by the defendant.

Gastown contends that it has no criminal liability because there was no *scienter* or criminal intent shown by the stipulated facts; that the station was leased to and under the control of an independent contractor; and that, when it did receive direct notice of the violation, it corrected the condition promptly and at considerable expense to it.

The state, on the other hand, maintains that statute requires no proof of knowledge or intent and that notice to the assistant manager was notice to the defendant.

Two main issues present themselves for judicial resolution:

1. Does strict criminal liability attach to the doing of an act proscribed by R. C. 1531.29 without proof of intent or knowledge of the accused?

2. Can the act of water pollution complained of herein be ascribed to the defendant in light of the contractual arrangement between defendant and its dealer?

Regarding the first issue, there is a dearth of Ohio cases on point. In fact, only one case, *State* v. *General Motors Corp.* (1973), 34 Ohio Misc. 21, is on all fours with

the instant case. In the former case, the Newton Falls Municipal Court acquitted the defendant therein, General Motors, holding that a showing of criminal intent was a prerequisite to conviction under R. C. 1531.29. That court further held that since General Motors was not aware of the spillage of offensive liquid caused by faulty gauges, it was exonerated from liability under the doctrine of *ignoranti facti excusat*, recognized in *Farrell* v. *State* (1877), 32 Ohio St. 456. The state of the law being what it is, it remains for this court to decide whether it will follow the holding in the *General Motors* case.

At the outset, it should be noted that R. C. 1531.29 sets out an offense *malum prohibitum*. Further, the statute, by its terms, does not require *scienter* or intent.

It is settled law in Ohio that a statute may criminalize a certain act or omission without specifying or requiring the element of knowledge or intent. In *State* v. *Weisberg* (1943), 74 Ohio App. 91, the court stated at pages 95 and 96:

"It is of course, within the power of the Legislature to make an act criminal without regard to the element of knowledge or intent. There are many acts which are so destructive of the social order, or where the ability of the state to establish the element of criminal intent would be so extremely difficult if not impossible of proof, that in the interest of justice the Legislature has provided that the doing of the act constitutes a crime, regardless of knowledge or criminal intent on the part of the defendant.

"In these cases it is the duty of the defendant to know what the facts are that are involved or result from his acts and conduct. Statutes punishing the sale of adulterated foods or prohibiting the sale of intoxicating liquor to minors are most frequently found in this class of cases.* * *
"* * *

"And in interpreting a statute, when this question is presented, the rule generally to be applied and as recognized by the great weight of authority is well stated in 22 Corpus Juris Secundum 85, Section 30:

" 'The legislature may make an act criminal without regard to the intent or knowledge of the doer. Whether

it has done so is to be determined from the language and the purpose of the statute. When the statute is silent, knowledge and criminal intent are generally essential if the crime involves moral turpitude, but not if it is *malum prohibitum.*' "

See, also, *Battles* v. *Ohio State Racing Comm.* (1967), 12 Ohio App. 2d 52, 56, 57:

"There are certain classes of offenses which are *malum prohibitum* where *scienter* is not an element and need not be proved. See *Solomon* v. *Liquor Control Commission* (1965), 4 Ohio St. 2d 31, 35, and the authorities therein cited. However, offenses of such nature, in which it is immaterial that the defendant acted in good faith, or did not know that he was violating the law, are limited to certain rough classifications as set forth in *City of Toledo* v. *Kohlhofer* (1954), 96 Ohio App. 355. * * *"

The rough classifications alluded to in the foregoing quotation are found in *Toledo* v. *Kohlhofer, supra,* at page 362, and consist of categories of *malum prohibitum* statutory offenses recognized by the United States Supreme Court as traditionally not requiring intent or *scienter.* They include (1) illegal sales of intoxicating liquor; (2) sales of impure or adulterated food or drugs; (3) sales of misbranded articles; (4) violations of anti-narcotic Acts; (5) criminal nuisances; (6) violations of traffic regulations; (7) violations of motor-vehicle laws; and (8) violations of general police regulations, passed for safety, health or well-being of the community. *Morissette* v. *United States* (1952), 342 U. S. 246, 262.

As previously mentioned, no Ohio appellate court has ruled that the R. C. 1531.29 is a regulatory statute imposing strict liability upon the commission of the offensive act. In fact, in a case involving a prosecution under the fish and game statutes (now R. C. 1533.63 and .64), a truck driver, possessing and transporting undersized catfish in boxes loaded on his truck without his knowledge by fish company workers, was acquitted on the ground that he did not have knowledge of the undersized fish or the means of acquiring such knowledge. *State* v. *Williams* (1952), 94 Ohio App. 249. The court in the *Williams* case, after

reviewing a number of early Ohio decisions having divergent holdings (including *Farrell* v. *State, supra*) made this statement, at page 255:

"In the interest of reconciling the conflict between the *Birney* and *Kelbourne cases* [cases requiring *scienter*] and the *Kelly case* and subsequent decisions [*malum prohibitum* cases imposing strict liability], it is concluded that in the case of a statute defining an offense regardless of *scienter* where the means of knowledge are available to the accused or the act is such as to impose a duty (in the interest of the public weal) upon the offender at his peril to ascertain the fact of violation, knowledge is not an essential element to support conviction. In case an offender has the means of knowledge, *scienter* is inferred by reason thereof. In the cases where the offender acts at his peril, the duty is imposed upon him to ascertain the facts from which likewise, knowledge may be inferred. * * *,,

Restating the *Williams* rule, where the statute describing the *malum prohibitum* offense is silent as to intent, proof of intent or knowledge is not required to be shown:

1) where the accused had the means of knowledge relating to the facts of the violation, or

2) where, because of substantial and significant public interest involved the accused had a duty to ascertain the facts of violation.

The rule's second classification of offenses contemplates the eight categories of *malum prohibitum* offenses mentioned previously as part of the *Morissette* decision and describes the traditional strict liability *malum prohibitum* offenses.

The rule's first classification is the catchall for the balance of *malum prohibitum* cases not requiring proof of knowledge. Knowledge therein is inferred but not dispensed with. If the accused can show a lack of means of knowledge, then he has interposed a legally cognizable and effective defense to the charge.

The rule in the *Williams* case was cited with approval in *Toledo* v. *Kohlhofer, supra,* at page 362.

Does a violation of R. C. 1531.29 fall within the first or second classification of the cases under the *Williams* rule? To answer that question, it is necessary to examine the purpose of the statute.

Although R. C. 1531.29 is an older statute, it is nevertheless a measure designed to deter water pollution. Pollution of water and air has been the cause of increasing state and national concern. During the past decade, the federal and state governments have enacted strong anti-pollution legislation establishing pollution standards and creating environmental protection agencies. In the area of water pollution, the federal government has passed the federal Water Pollution Control Act, 86 Stat. 886, Sections 1362 *et seq.,* Title 33, U. S. Code, and Ohio has complemented R. C. 1531.29 with R. C. Chapter 6111, Water Pollution Control. The foregoing enactments have virtually stigmatized water pollution as a public nuisance. Strict enforcement of pollution laws is now recognized as being increasingly vital to the health and well-being of communities everywhere.

The court has reviewed all of the cases correctly cited in the briefs submitted by the parties and is of the opinion that the decisions in support of the state's position are more persuasive. Many of defendant's cases represent the older, more orthodox, common law view of intent.

In view of the foregoing, it is this court's opinion that R. C. 1531.29 is a regulatory statute passed for the safety, health and well-being of the community, and, as such, casts a strict duty upon the accused to ascertain the facts of violation. It properly belongs in the second classification of cases under the *Williams* rule. Accordingly, the answer to the issue of strict liability is in the affirmative. The defenses of accident or isolated occurrence will not exculpate the defendant from liability in the cause.

Defendant further asserts the defense that it was merely the owner and lessor of the property and service station involved in this case and that the station and business was operated and controlled by an independent contractor. In short, defendant maintains that the wrong party

has been charged by the state. If established, this defense would be a good defense to the complaint.

A copy of the dealer sales contract dated December 30, 1968, was proffered by defendant for the court's consideration in accordance with the stipulations of the parties.

Under paragraph 5 of the contract, the right of exclusive control and management of the business operation at the station is posited with the dealer who, not being an employee of defendant, is presumably an independent contractor.

Paragraph 4 of the contract obligates the dealer to maintain the station in good order and repair and replace equipment "damaged, destroyed, lost, stolen or otherwise in need of repair or replacement caused by acts or omissions of Dealer or Dealer's employees * * *."

It is unclear from a reading of the contract just whose duty it is to fix or replace equipment in need of repair or replacement *not caused* by the acts or omissions of dealer or dealer's employees. However, it is noted that Paragraph 4 extends to the defendant the "right to enter the station at any time for the purpose of inspecting the same and making repairs or replacements."

In light of actions of Gastown's officials in promptly correcting the cause of the accidental leak, cleaning up the spillage and then taking preventative measures, at considerable expense to it, and further, there being no stipulation that the defect in the malfunctioning valve was attributable to an act or omission of the dealer or his employee, it can be reasonably inferred that the duty and obligation with respect to inspection and repair of the defective dresser coupling attached to the defendant and not to the dealer. The activities of the defendant show that it, and not the dealer, took responsibility for the spillage and by reason thereof, the answer to the second issue is also in the affirmative.

Thus, defendant herein is found guilty as charged.