UNITED STATES, Appellee

v.

EUGENE HATTLEY, Private First Class,
U. S. Army, Appellant

3 USCMA 114, 11 CMR 114

No. 1355

Decided July 24, 1953

LT COL George M. Thorpe, U. S. Army, and 1ST LT Michael E. McGarvey,
U. S. Army, for Appellant.

Lt Col Thayer Chapman, U. S. Army, and 1st Lt Kenneth A. Howard, U. S. Army, for Appellee.

## Opinion of the Court

George W. Latimer, Judge:

The accused stands convicted by a general court-martial of leaving his post as a sentinel before being relieved properly in violation of Article 113, Uniform Code of Military Justice, 50 USC § 707. He was sentenced to a dishonorable discharge, total forfeitures and confinement for two years. The convening authority suspended the dishonorable discharge, but otherwise affirmed. A board of review in the office of The Judge Advocate General of the Army upheld the findings and sentence as modified and we accepted the cause to determine whether the law officer erred in his instructions to the court.

The accused was a member of a field artillery headquarters battery located in the combat zone in ▮ Korea. He had been on duty with his unit for nine months during which time he had, on many occasions, served as a sentry. The post which the accused manned at the time of the offense was a stationary post and the area was protected by a barbed wire inclosure. The post was located and the armaments selected so that an avenue of approach up a draw into the battery position could be covered by machine gun fire. Because of the terrain, a movement of the weapon around the perimeter for any appreciable distance would make it impracticable, or perhaps impossible, for the sentry to defend properly his assigned sector. The accused was posted as a sentry at 4:00 a.m. and his tour of duty was to last for two hours. Some one hundred feet away was another post protecting a second avenue of approach into the position. The sentry at that post testified that shortly after being posted the accused picked up his machine gun and personal weapon and moved over near the second sentry's post. He stayed there, saying nothing to the sentry, until about 5:00 a. m. when the officer of the guard found him out of position and ordered him back to his regular post.

The accused testified in his own behalf and sought to justify his actions by stating that shortly after being posted he had talked to the corporal of the guard over the telephone; that later he found the telephone was out of order; that he then went to the next post to get the time of day and to have the corporal of the guard notified of the telephone difficulties; that he disconnected the telephone and took the box with him when he left his post; and, that he had been off his post only a short time when the officer of the guard located him near the other post.

The problem posed in this case arises because the law officer ruled the testimony of the accused was admissible but limited its effect to the sentence. In his instructions to the court he stated:

". . . . any evidence regarding why the accused left his post without authority is immaterial to the issue of guilt or innocence; and that in determining guilt or innocence the court must disregard it. . . ."

Much of the criticism directed toward the instruction is founded on the contention that it announces a legal principle which is too broad and sweeping. Be that as it may, we need not concern ourselves with the correctness of the instruction as applied to all factual situations. We need only determine if it was prejudicial to the accused when considered in the light of the evidence in this case.

Article 113 of the Uniform Code of Military Justice, supra, provides:

"Any sentinel or look-out who is found drunk or sleeping upon his post, or leaves it before he is regularly relieved, shall be punished, if the offense is committed in time of war, by death or such other punishment as a court-martial may direct, but if the offense is committed at any other time, by

115

such punishment other than death as a court-martial may direct."

The wording of the act points clearly to a congressional intent to re-enact a time-honored and well-known rule of military law that a sentry remains on his post until relieved properly. The severity of the punishment under war-time conditions is predicated upon the consequences flowing from a failure to remain on a post where the mission of the sentry can be fulfilled. The safety of a unit from a squad to an Army depends on strict compliance with guard orders and those include the duty to remain on post until relieved by one in authority. The facts of this case do not move us to believe that the accused should be excused for failure to fulfill his duty. The defense for the battery was planned so that the machine guns located at the two adjacent posts could be used to cover two avenues of approach leading into the position. Due to terrain conditions between the two, the machine gun at one could not cover adequately the area sought to be protected by fires from the other. When the accused picked up his weapon and moved over near the adjacent post, one draw was left unprotected. This might have permitted enemy troops to infiltrate into the center of a battery position, unchallenged and unobserved. Had that happened, disaster would have occurred.

Winthrop in his Military Law and Precedents, Second Edition, Reprint 1920, at page 616, in discussing Article of War 39, 10 USC § 1510, sets out the object of the Article. The following is quoted from his works:

"OBJECT OF THE ARTICLE. The purpose of this provision, (which may be traced to Art. 32 of the Code of James II, as derived from Art. 50 of Gustavus Adolphus,) is to secure on the part of sentinels that alert watchfulness and steadfastness which are the very essence of their service. These qualities, important as they are to the protection from depredation or loss by fire of the public property collected at a military station, are, *in time of war, absolutely essential to ensure a camp or post against the danger of surprise and capture by a hostile force. Grave as must be on all occasions the offences specified in the Article, it is in the field before the enemy that they become of the most aggravated character, and it is especially to prevent their occurrence at such critical seasons that they are made punishable with death."* [Emphasis supplied.]

Article 113 of the Code, supra, which re-enacts and is the succeeding section to Article of War 39, states specifically that a sentinel must be regularly relieved before he may leave his post. There is a method of effecting a relief well known and understood by all members of the guard. So far as we are able to ascertain, the method used by the accused in this case is and has been condemned by military law, use and custom for the reason that the right to leave his post cannot be accorded to the man on the post. If he had that right the whole scheme of a security guard would be a death trap to the persons being protected. The rule is expressed on pages 616–617 of Winthrop, supra:

"After showing the due detail and posting of the accused, this offence is usually established by evidence that, when the post was officially visited during a tour of duty of the accused, he was not found upon it, and that he had not been for any cause relieved by an officer or non-commissioned officer of the guard or other competent authority. Or it may be shown that he was, under similar circumstances, discovered to be at a place—his quarters for example—quite other than his post, or was seen *off* his post and at a material distance from it."

Counsel for the accused argue vigorously that we should condemn the instruction because there are instances when a sentry has good reason to abandon his post. Assuming, without deciding, that there is merit in the contention, it is axiomatic that in testing for prejudicial error we measure the instruction by the evidence in the case. Therefore, if the story as related by the accused did not, in law, constitute a defense to the charge, then it matters not

that some other hypothetical and critical situation might arise which would make the instruction incorrect in law and prejudicial to that accused. We encounter no difficulty in holding that the reasons advanced by the accused in this instance did not excuse or justify his behavior. We cannot believe that anyone familiar with sentry duty in a combat area in time of war would consider accused's conduct as reasonable, assuming reasonableness is an appropriate test. Knowing his mission and knowing he should not leave his post until relieved properly, he picked up his telephone, his personal weapon and his machine gun, and moved them over to another post. He claimed his purpose was to find out the time and to notify guard headquarters that telephone communications were out of order. However, he failed to use available and alternate methods of alerting the guard and when he arrived at his new position near the other post, he took no affirmative action to expedite his return to his regular post. He did not pass any information to the other sentry; he knew his machine gun was of no value either tactically or mechanically unless sighted and in position; he knew it would be impossible to re-establish communications with the telephone disconnected; and he knew his absence from his proper post would endanger the safety of the battery. If his purpose was to get communications re-established, he did it in the most unreasonable, unusual and dangerous way; if it was to determine the time, his acts were absurd. According to him the posts were not over 100 feet apart; they were within voice-carrying distance; and yet he never notified the other sentinel. He knew his communications would be checked by battery personnel at frequent intervals and that the difficulties, if any, would be discovered in short order, even though he remained at his post, as it was standard operating procedure for a person in headquarters to call by telephone, and an officer or noncommissioned officer to visit the various posts during each two-hour period. Accused was armed with an individual weapon and he could have alerted the guard in any serious emergency by firing or he could have accomplished the necessary results by shouting. He had been on sentry duty repeatedly during his nine months on duty, and he does not suggest that he was not familiar with all the orders for, and duties and responsibilities of, a sentinel. Telephone communications are difficult to maintain under field conditions, and if every time they fail sentries may desert their posts, then the principles underlying internal security must be abandoned. Many sentry posts are maintained without telephone communications and while they are advantageous their absence does not justify leaving a post unprotected. It is not only unreasonable, it is inexcusable to leave a unit unguarded for that reason. Accordingly, the evidence was not sufficient to constitute a defense and the instruction rightly informed the court not to consider the testimony as bearing on the merits.

Because over the years the offense has been considered inexcusable, military law has permitted a sentry or sentinel to explain why he left his post. This information is helpful in assessing the sentence. Referring again to Winthrop, *supra*, at page 617, we quote:

"Circumstances, however, which could not constitute a legal *defence,* may be admissible as evidence going to *extenuate* the offence committed and reduce the measure of the punishment, or to induce a mitigation of the punishment, after sentence, by the reviewing authority. Thus it may be shown that the accused, when posted as a sentinel, was ailing or disabled; or that he had already been overtasked by excessive guard duty or other continuous service; or that he had temporarily left his post under an extraordinary stress of weather; or that, in irregularly relieving himself or allowing himself to be relieved, he had but observed a usage sanctioned by his official superiors; or that, being a recruit, he had not been properly instructed in his duties as a sentinel."

The law officer permitted the court-martial to consider the evidence in extenuation and in so doing he granted the accused all the rights and benefits to

which he was legally entitled. Undoubtedly, the members took into account the explanation offered by the accused and other extenuating and mitigating factors appearing in the record as the sentence of two years is unusually light for the commission of this offense.

For the reasons stated, we affirm the holding of the board of review.

BROSMAN, Judge (concurring):

I agree with the author of the principal opinion. Without detracting in any way from what he has said, I append three brief comments of my own.

## II

I am sure that the accused was prejudiced, if the instruction with which we are concerned here was erroneous. However, I do not believe that legal error was committed, but rather that the law officer merely spoke without great care, and used language, which, standing alone, is perhaps susceptible of an interpretation broader than was probably intended—certainly than is correct. However, Judge Latimer has properly suggested that instructions are not to be measured in vacuo, but must be evaluated in light of the evidential setting in which they were furnished. Following this sound direction in the instant case leads me straight to the conclusion that the law officer did not err. However inartful the phrasing, it is certainly not error to tell a court-martial that certain matter does not constitute a legal excuse for crime, if, in truth, it does not.

## III

The notion that there was any real question as to whether the accused left his post—in fact or in law—is, I believe, a wholly imaginary one. There simply was no genuine issue on this score. The accused's outpost was of a stationary—and not a walking—character. According to the testimony of the officer of the guard, it was situated approximately 100 yards from that to which Private Cuff was assigned. Each outpost commanded a view of a different draw, and it was the duty of the sentinel in each instance to observe his

post's draw and—according to the record—"guard against the approach of the enemy from the mass of hills in the background." The draw behind accused's post could not be overlooked from Cuff's, nor that behind Cuff's from accused's. Yet it is undisputed that the accused left his station physically and went to a point some four yards from Cuff. How long he remained there, and his purpose in going, constituted the sole subjects of controversy. The accused's only explanation was that his telephone was out of order. For whatever it may have been worth, however, the accuracy of this explanatory statement could not be verified for the reason that, when the accused departed to join Private Cuff, he tore "the cable . . . loose from the phone."

Whether one may be deemed to have "left his post" depends in my view wholly on the post's character and mission. Under certain circumstances, one might well be deemed to have remained on his post although he had traveled several hundred yards. Yet under others, the distance of a few feet may constitute the difference between leaving and remaining. The accused's post was a stationary one, and its mission was to guard a particular draw. Given the point to which the accused moved, this mission could not possibly have been performed. I believe, therefore, that as a matter of law it may be said that Hattley left his post.

If I am correct in this conclusion, the remaining question becomes one of whether—having left—a legal excuse for the departure was offered by the accused. I am sure that none was. In this connection, Lieutenant Force, the officer of the guard, was asked: "And under what circumstances, if any, was he [the accused] allowed to leave his post?" To this he replied: "Only if relieved." Of course there was no suggestion whatever that the accused had been relieved. Again Lieutenant Force was asked: "Would he [the accused] under any circumstances be authorized to leave his post and go over to Post Number 2 [Private Cuff's post]?" His reply was: "No, sir." Palpably the accused was fully aware of this. The

record of trial at pages 29 and 30 reports the following colloquy during the course of cross-examination of the accused:

"Q. Isn't it a fact that you are not supposed to leave your stationary post unless you are properly relieved?

"A. Sir, you can be relieved by telephone.

"Q. But had you been relieved by telephone?

"A. No, sir."

Fully accepting the accused's version, I am sure that his explanation, described earlier in this memorandum, does not place the transaction in which he participated on the level of those extraordinary and critical situations which may operate to excuse a sentinel who leaves his post before being properly relieved. If this is true, he was not excusable here, and the law officer was wholly justified in saying so.

### IV

I am not at all disturbed by the defense's suggestion that the instruction here was tantamount to a direction of findings for the Government. Factually this might have been true, but it was certainly not as a matter of law. Let us suppose that an accused, charged with robbery, admits all of the damaging facts alleged, but defends solely on the ground that he had kept the first two fingers of his right hand crossed at all times during the performance of the incriminatory acts. I take it that none would deny the propriety of an instruction to the effect that the fact of finger-crossing is wholly irrelevant. Yet, in the absence of other defense, this instruction would be tantamount factually and indirectly to a direction of findings of guilty. The nub of the matter is that whether certain facts constitute an excuse is a question of law, which the law officer here decided—and not incorrectly in my view. See in this connection Horning v. District of Columbia, 254 US 135, 65 L ed 185, 41 S Ct 53.

QUINN, Chief Judge (dissenting):

I dissent.

Leaving a post before being properly relieved is one of the most serious offenses known to military law. Its effect upon the security of a command and the safety of individuals whose lives the sentinel is required to protect is incalculable. In time of war its commission is universally punishable by death. However, we are not here concerned with the gravity of the offense. We should not affirm findings arrived at under improper instructions solely because the offense charged is serious. Here, we are concerned with the correctness of the law officer's instructions and with the prejudicial effect of error therein.

To convict in this instance the court-martial was required to find the following facts:

1. That the accused was posted or on his post as a sentinel, and,

2. That he left his post before being regularly relieved.

Paragraph 192, Manual for Courts-Martial, United States, 1951. Had the law officer limited his instructions to these essential elements I would have no doubt that he discharged his obligations under Article 51(c), Uniform Code of Military Justice, 50 USC § 626. The instructions did not end there, however, for he then, over the objection of the defense counsel, stated:

". . . . any evidence regarding why the accused left his post without authority is immaterial to the issue of guilt or innocence; and that in determining guilt or innocence the court must disregard it. . . ."

In this case there was no issue of whether the accused was posted, for this was admitted. The sole issue under the facts, as correctly outlined in the majority opinion, related to the second element of the offense. With reference to this element the accused contended that he had not left his post within the meaning of the Article, because his action in going to the next post was necessary, and, under the circumstances, reasonable. The law officer's instruction precluded consideration of this position by the court and hence we must appraise this instruction in the light of the military authorities on the subject.

**119**

Paragraph 192 of the Manual, supra, provides:

"A post is not limited by an imaginary line, but includes, according to orders or circumstances, such surrounding area as may be necessary for the proper performance of the duties for which the sentinel or lookout was posted. The sentinel or lookout who goes anywhere within that area for the discharge of his duties does not leave his post . . . . The offense of leaving post is not committed when a sentinel or lookout goes an immaterial distance from the point, station, area, or object which was prescribed as his post, unless he goes such a distance that his ability fully to perform the duty for which he was posted is impaired."

Colonel Winthrop in his Military Law and Precedents, 2d ed., 1920 Reprint, page 616, states that this offense is committed when the guard is "discovered to be at a place—his quarters for example —quite other than his post, or was seen off his post and at a material distance from it."

Applying these principles, an Army board of review in United States v. Beaucage, 15 BR 101, declared that a sentinel who went from the prescribed limits of his own post to a point within the limits of a contiguous post to investigate a noise, and then was found sleeping within the limits of the contiguous post, had not left his post within the meaning of the Article.

It is clear from the foregoing that a movement made in the discharge of a sentinel's duties as required by circumstances, and which does not impair his ability fully to perform the duty for which he was posted, is entirely proper. It further appears settled that the limits of a post can very well be extended if necessity demands, and if a sentinel moves into that extended area for a reasonable purpose, he has not left his post. In every case the reasonableness of the purpose and the materiality of the distance involved are questions of fact and must be resolved by the court.

Here, although the general nature of the terrain was described, there was no clear showing that the accused's ability to perform the duty for which he was posted, was impaired. The accused was posted at a gun emplacement, equipped with a machine gun and armed with a personal weapon to protect himself and his position in the event of enemy attack. Neither of these instruments are ordinarily considered mere warning devices. His warning device was a telephone. He was expected to use it to warn of hostile advances in the area and thereby permit his organization to cope with the situation before an actual attack was launched. Had he discovered his telephone line had been severed five yards to his rear, would he have been properly performing his duties by remaining inactive in his position and then alerting his unit by firing his weapon? I think not. Obviously, he should attempt to remedy the situation and preserve his quieter means of alerting his organization. If it is reasonable for him to move five yards in the proper performance of his duty, then reasonableness of the purpose and of the distance must be considered by the court in resolving controverted factual issues of this type.

It is fundamental that the court finds the facts, and the law officer pronounces the applicable law. Neither can invade the province of the other. Morrissette v. United States, 342 US 246, 96 L ed 288, 72 S Ct 240. The instructions in this case invaded the fact-finding field at a critical point. By directing the court to disregard the accused's statement, the law officer ruled that the materiality of the distance and of the purpose, the ability of the accused to perform his duties, the limits of his post under his orders, or under the circumstances, had all been decided for them. The one issue in the case had been resolved adversely to the accused. In short, he directed the court to return a finding of guilty. This is a brand new and extremely dangerous practice in criminal procedure. I cannot subscribe to it.

For these reasons, I would reverse the decision of the board of review and order a new trial.