WILD *v.* STATE

[No. 21, October Term, 1952.]

*Decided December 3, 1952.*

The cause was argued before MARKELL, C. J., and DELAPLAINE, COLLINS and HENDERSON, JJ.

*William A. Grimes,* with whom were *Randall C. Coleman, Jr.* and *Ober, Grimes & Stinson,* on the brief, for appellant.

*Kenneth C. Proctor,* Assistant Attorney General, with whom were *Hall Hammond,* Attorney General, *Anselm Sodaro,* State's Attorney for Baltimore City and *Edwin A. Gehring,* Assistant State's Attorney, on the brief, for appellee.

HENDERSON, J., delivered the opinion of the Court.

The appellant was convicted by Judge Tucker, sitting without a jury, in the Criminal Court of Baltimore, on charges of allowing or permitting the discharge of fuel oil into the waters of Baltimore harbor, in violation of State law and a city ordinance; and fined $200. He was the First Assistant Engineer on the Steamship Thomas T. Leathers, an American Liberty ship owned by the United States and operated by the Eastern Steamship Lines for the United States. The Master, Chief Mate and Chief Engineer, who were indicted and tried along with the appellant were acquitted. The sole question argued on appeal is whether a motion for a verdict of "not guilty" at the close of the State's case should have been granted.

On December 28, 1951 the Leathers was moored to the west side of Recreation Pier, having no cargo aboard. At 2:30 P. M. a barge of the Harbor Towing Company, M. P. 23, loaded with 4000 barrels of fuel oil, "bunker, sea," came alongside and made fast. The barge captain testified that he passed up his hose, by means of a derrick, and that two colored men on the ship took it and hooked it on to a valve after he had passed up to them two bolts and a wrench. These men then told him to go ahead and he started pumping at about 3:20. There was a white man in an officer's cap on deck at the time. After pumping for some time he learned that the valve on his pump was not working, so that no oil was being delivered. Apparently this fact was discovered by the Superintendent of the Harbor Towing Company, who went aboard the Leathers at 4:20 P. M., talked to the barge captain, and returned in a tug boat with the port engineer. They went aboard the barge and the latter repaired the valve. The barge captain, the superintendent and the port engineer all testified that a man in an officer's cap on the ship told them to resume pumping, and they did so at about 5:20 P. M. This man asked how long it would be before they were ready to pump. They said they were ready. He said: "Get the oil on. I don't want to be here all night." They were unable to identify the man who gave the order, as it was rather dark. Pumping continued until 7:30 P. M. When the valve on the ship was cut off after it was discovered that some 1000 barrels of oil delivered in this period had gone overboard. It was shown by sample analysis that the oil in the water was the same type as that in the barge. The superintendent testified he was called to the ship about 8:45 P. M. and talked to the Chief Engineer and the appellant. They told him they had been pumping water (ballast) out of the tank to which the oil hose had been connected, so that the oil was pumped or siphoned out on the opposite side of the ship as fast as it came in. They both told him they didn't give the order to pump oil and didn't know the oil was coming aboard.

The relief, or night, mate testified he came aboard at 5 P. M. He saw the barge alongside, the scuppers plugged, the hose connected and a red flag flying on the ship. He said he saw an oilslick alongside about twenty minutes after he came aboard and reported it to the Chief Mate, who said he would go down and tell the First Assistant. He. saw the Chief Mate talking to the First Assistant Engineer, but did not hear what was said. He also testified that he talked to some people on the barge and they told him their pump was broken down. He thought pumping was not resumed until about 11 P. M. The master was not on the vessel during the whole time the barge was alongside, nor were the second and third mates. The Chief Mate was aboard until he went to supper some time after he was relieved by the relief mate. The Chief Engineer was aboard but went ashore to get his dinner sometime before the relief mate came aboard. The witness also testified that it was the duty of the First Assistant Engineer to make hose connections on deck to the fuel tanks; the deck force had nothing to do with the loading operation, except the flag and the scuppers.

The appellant contends that the State failed to make out a case and that his motion for directed verdict should have been granted. He argues that the First Assistant Engineer could not be liable under the City Ordinance, Section 49, Article 11 of the Baltimore City Code of 1950, since he was not the "owner, master or person in charge of any boat, vessel, barge or water craft in the harbor of Baltimore." He admits, however, that the State Water Pollution Control law, Section 40, Article 66(c) of the Code of 1951 (ch. 239, Acts of 1949) is broader and makes it "unlawful for any person to discharge or permit the discharge of oil in any manner into or upon the waters within the jurisdiction of the State of Maryland from any vessel, ship or boat of any kind." While he admits in his brief that conviction under the second or third counts of the indictment would stand, if the State had proved

"that the defendant either physically performed some act resulting in the discharge, or knowingly or negligently permitted someone else to discharge oil," he contends that there is a complete failure to prove scienter.

If we assume, without deciding, that proof of *scienter* is necessary under this statute (*cf. Morissette v. United States,* 342 U. S. 246, 72 S. Ct. 240), it is nevertheless clear that knowledge may be inferred from circumstances, even where there is positive denial. *Moore v. State,* 199 Md. 676, 87 A. 2d 577; *Shelton v. State,* 198 Md. 405, 413, 84 A. 2d 76, 80. As we said in *Hayette v. State,* 199 Md. 140, 145, 85 A. 2d 790, 792, "on questions of scienter reason for disbelieving evidence denying scienter may also justify finding scienter."

In the instant case it is difficult to believe that the engineer officers on the ship were not notified that the barge was alongside prepared to deliver oil in the early afternoon, when the appropriate flag was hoisted and the scuppers stopped by the deck force. The work of attaching the hose and opening the ship's valves to particular tanks was peculiarly within the province of the engineer force, and would hardly have been within the competence of the deck force or any interlopers, nor could they possibly know what tanks the oil should go into. However, the testimony is that no oil was delivered at that time, and not until pumping was resumed at 5:20, upon orders from an unidentified person in an officer's cap. It is most unlikely that such an order would have been given by a deck officer, since the loading of oil was not their responsibility, nor would the completion of the delivery affect in any way the duration of their watches. One might infer that the First Assistant Engineer, the only engineering officer aboard at that time and the person directly responsible, was the one who gave the order, without being aware that the water pump was running on the very tank to which the oil hose was connected through the appropriate valves, or without realizing what the result might be. But the evidence goes further than that. The relief mate testi-

fied that he saw an oil slick along the starboard side of the ship at about 5:20, after making his rounds of the vessel and finding everything secure on deck. He reported it to the Chief Mate, who in turn reported it to the First Assistant Engineer. Yet the pumping continued until 7:30 P. M., according to the testimony of the barge captain and the other two Towing Company witnesses. Certainly this evidence was legally sufficient to support a finding of actual knowledge on the part of the First Assistant Engineer that oil was in the water alongside the ship, and presumably escaping from the ship, at least two hours before the cause was found and corrected. We think the motion was properly refused.

*Judgment affirmed, with costs.*