# Order

Michigan Supreme Court
Lansing, Michigan

January 31, 2014

145491

PEOPLE OF THE STATE OF MICHIGAN,
        Plaintiff-Appellee,

v

ALAN N. TAYLOR,
        Defendant-Appellant.

SC: 145491
COA: 295275
Kent CC: 08-011574-AR

_____/

Robert P. Young, Jr.,
Chief Justice

Michael F. Cavanagh
Stephen J. Markman
Mary Beth Kelly
Brian K. Zahra
Bridget M. McCormack
David F. Viviano,
Justices

On November 7, 2013, this Court heard oral argument on the application for leave to appeal the May 22, 2012 judgment of the Court of Appeals. On order of the Court, the application is again considered, and it is DENIED, because we are not persuaded that the questions presented should be reviewed by this Court.

MARKMAN, J. (*concurring*).

Defendant, Alan Taylor, a business entrepreneur, was prosecuted for violations of the wetlands protection act, MCL 324.30301 *et seq*., Part 303 of the Natural Resources and Environmental Protection Act, MCL 324.30301 *et seq*. Taylor, the founder and principal owner of a medical-device manufacturer, Hart Enterprises, moved his company from Illinois to an industrial park in Sparta, Michigan, in 1998. In 2006, when the company was in the process of doubling the number of Michiganders it employed from 55 to 110, Taylor decided that the company needed to expand its employee parking lot in order to accommodate this growth. As the expansion was proceeding, the Department of Environmental Quality (DEQ) initiated an investigation into whether the expanded lot was intruding upon a wetland portion of Taylor's industrial-park property. Although DEQ officials first visited Sparta to assess the situation in May 2006, it took the department more than a year and a half — until January 2008 — to inform Hart that in its view the parking-lot-expansion project had resulted in the filling-in of one-quarter of an acre of regulated wetland and the drainage of another two-thirds of an acre of regulated wetland. Since the DEQ had not issued a permit for these alleged environmental intrusions, it ordered Taylor to undo the parking-lot expansion and restore the wetland.

Taylor denied that the area constituted a protected wetland and decided to continue with the project. Among other things, he noted that environmental engineers who had monitored the project had never mentioned the presence of any wetland on the property. Moreover, the DEQ's own lead investigator himself later acknowledged at trial that it was not readily apparent that a wetland was present on Taylor's property. Nonetheless, criminal charges were eventually brought against Taylor, and he was convicted of one count of depositing fill material in a regulated wetland without a permit and one count of

constructing a parking lot in such a wetland without a permit. He was ordered to pay fines and costs of $8,500.

The lower court proceedings in this case fostered much confusion concerning which arguments Taylor properly preserved for appellate review.[1] It appears, at least in my judgment, that Taylor's most compelling legal arguments were waived for one reason or another, and on that basis alone, I concur with regret with this Court's denial order. However, I write separately because I believe that this case highlights legal issues that are likely to arise increasingly in the prosecution of administratively defined *malum prohibitum* criminal offenses within this state and that our Legislature might wish to exercise care in avoiding defects in due process of the type that have come increasingly to characterize criminal offenses within our federal justice system.[2]

*First*, the statute under which Taylor was convicted provides that a person may not "[d]eposit or permit the placing of fill material in a wetland" or "[c]onstruct, operate, or maintain any use or development in a wetland." MCL 324.30304(a) and (c). A person who violates this provision is guilty of a misdemeanor punishable by a fine of not more than $2,500. MCL 324.30316(2). The district court, accepting the notion that the statute

---

[1] For instance, Taylor argued on appeal to the Court of Appeals that the trial court erroneously admitted into evidence an aerial photograph and the National Wetlands Inventory. *People v Taylor*, unpublished opinion per curiam of the Court of Appeals, issued May 22, 2012 (Docket No. 295275), p 1. The Court of Appeals, however, determined that Taylor had conceded the admissibility of the aerial photograph and the National Wetlands Inventory and that his waiver extinguished any error. *Id*. at 2. Taylor also argued on appeal to the Court of Appeals that Mich Admin Code, R 281.921(1)(b) is an invalid product of an unconstitutional delegation of legislative authority and that it defines the term "contiguous" incompatibly with the wetlands protection act. *Id.* The Court of Appeals, however, determined that Taylor had expressly abandoned those arguments on appeal in the circuit court and that his waiver extinguished any error. *Id*. at 3. Additionally, Taylor argued on appeal in the Court of Appeals that violations of MCL 324.30304 require proof of *mens rea* and are not strict-liability offenses. *Id.* at 5. The Court of Appeals again determined that Taylor had waived any argument concerning that issue and that any error had been extinguished. *Id.*

[2] It is estimated that there are 4,500 federal crimes in the United States Code, not to mention the far larger, and virtually uncountable, additional number of federal regulations outside Title 18 of the code that impose criminal penalties. See US House of Representatives Judiciary Committee, Press Release, *House Judiciary Committee Creates Bipartisan Task Force on Over-Criminalization* (released May 5, 2013), available at <http://judiciary.house.gov/index.cfm/2013/5/housejudiciarycommitteecreatesbipartisan askforceonovercriminalization> (accessed January 24, 2014).

imposes strict liability, instructed the jury that the prosecutor had to prove beyond a reasonable doubt only that Taylor did the filling and that he failed to obtain a permit, not that he had to be aware in any way that he was filling in a wetland.[3] On appeal, the circuit court reached a similar conclusion that "MCL 324.30304 is a strict liability 'public welfare offense,'" concluding that it is "the type of statute envisioned in *Morissette* [*v United States*, 342 US 246 (1952)]." *Michigan v Taylor,* unpublished opinion of the Kent County Circuit Court, issued August 28, 2009 (Docket No. 08-11574-AR).[4] As a public-

---

[3] It appears that the district court determined that a violation of MCL 324.30304 constitutes a strict-liability offense as a result of the following inexplicable exchange between the parties:

> *The Court*: . . . I don't know what the mens rae [sic] requirement is for this. Does he have to know it's a violation?
>
> [*Defense Counsel*]: There is (indiscernible) aiding and abetting statute I think you do.
>
> *The Court*: Well I think — isn't this strict liability? I mean, just if you —
>
> [*Defense Counsel*]: Under [the] wetlands act it's strict liability. Yes.

[4] In *Morissette*, the United States Supreme Court described public-welfare offenses as those that "do not fit neatly into any of such accepted classifications of common-law offenses, such as those against the state, the person, property, or public morals." *Morissette*, 342 US at 255. Such offenses, the Court explained, may be regarded as offenses against the authority of the state, "for their occurrence impairs the efficiency of controls deemed essential to the social order as presently constituted." *Id.* at 256. Further expounding on the nature of public welfare offenses, the Court asserted:

> In this respect, whatever the intent of the violator, the injury is the same, and the consequences are injurious or not according to fortuity. Hence, legislation applicable to such offenses, as a matter of policy, does not specify intent as a necessary element. The accused, if he does not will the violation, usually is in a position to prevent it with no more care than society might reasonably expect and no more exertion than it might reasonably exact from one who assumed his responsibilities. Also, penalties commonly are relatively small, and conviction does no grave damage to an offender's reputation. Under such considerations, courts have turned to construing statutes and regulations which make no mention of intent as dispensing with it and holding that the guilty act alone makes out the crime. [*Id.*]

welfare offense, the circuit court explained, MCL 324.30304 need not regulate conduct that seriously threatens the community's health or safety in order to impose strict liability. *Id.* Additionally, it observed that a violation of MCL 324.30304 results in a misdemeanor conviction and asserted therefore that its "'penalties . . . are small, and conviction does [not do] grave damage to an offender's reputation.'"[5] *Id.*, quoting *Morissette*, 342 US at 256. On further appeal, the Court of Appeals declined to consider whether a violation of MCL 324.30304 constitutes a strict-liability offense, reasoning only that "defendant has waived this issue and any error has been extinguished." *People v Taylor*, unpublished opinion per curiam of the Court of Appeals, issued May 22, 2012 (Docket No. 295275), p 6.[6]

It is settled in Michigan that strict-liability offenses, though disfavored, may be "proper under some circumstances." *People v Quinn*, 440 Mich 178, 188 (1992). Indeed, "a state may decide under the police power that public policy requires that certain acts or omissions to act be punished regardless of the actor's intent." *Id.* at 186-187. These public-welfare offenses generally are designed "to protect those who are otherwise unable to protect themselves by placing 'the burden of acting at hazard upon a person otherwise innocent but standing in responsible relation to a public danger.'" *Id.* at 187 (citations omitted). As the United States Supreme Court has explained:

---

Nonetheless, in evaluating a federal theft statute, 18 USC 641, the Court declined to construe the mere omission of any mention of intent "as eliminating that element from the crimes denounced." *Id.* at 263. The Court found it significant that it had not located "any instance in which Congress has expressly eliminated the mental element from a crime taken over from the common law." *Id.* at 265. See also *People v Tombs*, 472 Mich 446, 451 (2005) (opinion by MARILYN KELLY, J.) ("[W]e tend to find that the Legislature wanted criminal intent to be an element of a criminal offense, even if it was left unstated.").

[5] A similar conclusion was reached by the Court of Appeals in *People v Schumacher*, 276 Mich App 165 (2007), regarding MCL 324.16902(1) of the Natural Resources and Environmental Protection Act, which provided at that time that "[a] person shall deliver a scrap tire only to a collection site registered under [MCL 324.16904], a disposal area licensed under part 115, an end-user, a scrap tire processor, a tire retailer, or a scrap tire recycler, that is in compliance with this part." Assessing whether the Legislature intended an otherwise silent statute to "nevertheless require fault as a predicate to guilt," the Court of Appeals concluded that "the Legislature intended in [MCL 324.16902(1)] to establish a so-called public-welfare offense: the only intent necessary to establish its violation is that the accused intended to perform the prohibited act." *Id.* at 171, 174-175.

[6] The Court of Appeals explained that "when trial counsel responded that 'under t[he] wetlands act it's strict liability,' he waived any argument that these were anything other than strict liability offenses." *Taylor*, unpub op at 5.

Typically, our cases recognizing such offenses involve statutes that regulate potentially harmful or injurious items. In such situations, we have reasoned that as long as a defendant knows that he is dealing with a dangerous device of a character that places him "in responsible relation to a public danger," he should be alerted to the probability of strict regulation, and we have assumed that in such cases Congress intended to place the burden on the defendant to "ascertain at his peril whether [his conduct] comes within the inhibition of the statute." Thus, we essentially have relied on the nature of the statute and the particular character of the items regulated to determine whether congressional silence concerning the mental element of the offense should be interpreted as dispensing with conventional *mens rea* requirements. [*Staples v United States*, 511 US 600, 607 (1994) (citations omitted) (alterations in original).]

However, as illustrated by the instant case, the wetlands protection act regulates seemingly innocuous conduct including, as here, the expansion of a small parking lot. While that conduct may concededly under certain circumstances cause harm to a wetland, it is not necessarily of the type that even a "reasonable person should know is subject to stringent public regulation and may seriously threaten the community's health or safety." *Liparota v United States*, 471 US 419, 433 (1985).[7] Imposing strict liability on an individual for a violation of MCL 324.30304 has the potential to subject Michigan property owners to criminal prosecution even when they are unaware that a property at issue comprises a wetland and, as a result, that certain not-obviously-damaging conduct affecting that land is prohibited. Moreover, while this case involved an industrial property, owners of residential properties are equally at risk of unknowingly exposing themselves to criminal prosecution under the act.

---

[7] As observed in dissent in *People v Wilson*, 159 F3d 280, 295 (CA 7, 1998) (Posner, C.J., dissenting),

[s]ometimes the existence of the law is common knowledge, as in the case of laws forbidding people to own hand grenades, forbidding convicted felons to own any firearms, and requiring a license to carry a handgun. And sometimes, though the law is obscure to the population at large and nonintuitive, the defendant had a reasonable opportunity to learn about it, as in the case of persons engaged in the shipment of pharmaceuticals who run afoul of the criminal prohibitions in the federal food and drug laws. [Citations omitted.]

And sometimes it is neither "common knowledge" nor a matter as to which there is a "reasonable opportunity to learn about it" because one is in a particular business, such as a medical-device manufacturer who engages in the expansion of his small parking lot.

As a result, our Legislature might wish in the future to review this and similar criminal statutes and communicate with clarity and precision its specific intentions concerning which public-welfare offenses, or administratively defined *malum prohibitum* offenses, should be treated by the judiciary of this state as strict-liability offenses, "'criminaliz[ing] a broad range of apparently innocent conduct.'" *Staples*, 511 US at 610, quoting *Liparota*, 471 US at 426. It is the responsibility of our Legislature to determine the state of mind required to satisfy the criminal statutes of our state, and the judiciary is ill-equipped when reviewing increasingly broad and complex criminal statutes to discern whether some *mens rea* is intended, for which elements of an offense it is intended, and what exactly that *mens rea* should be.

*Second*, the Legislature has defined a "wetland" as

land characterized by the presence of water at a frequency and duration sufficient to support, and that under normal circumstances does support, wetland vegetation or aquatic life, and is commonly referred to as a bog, swamp or marsh, and which is any of the following:

(*i*) Contiguous to the Great Lakes or Lake St. Clair, an inland lake or pond, or a river or stream. [MCL 324.30301(1)(m) (codified as MCL 324.30301(1)(p) at the time of trial).]

Although the prosecutor's witnesses testified that the land in question supported wetland vegetation, it appears that no witness identified the land as being of the kind that is "commonly referred to as a bog, swamp, or marsh."[8] Indeed, as previously noted, even

---

[8] While defendant apparently argued on appeal in the circuit court that the proofs failed to satisfy the definition of "wetland," the circuit court determined that the prosecution was not required to set forth evidence of the land as being "commonly referred to as a bog, swamp, or marsh" to satisfy the definition. In reaching its conclusion, the circuit court relied on *People v Kozak*, unpublished opinion per curiam of the Court of Appeals, issued June 19, 2008 (Docket No. 272945) p. 2, which determined that the phrase

"commonly referred to as a bog, swamp, or marsh" as used in the statute to refer back to "land" is clearly intended to facilitate the ordinary reader's understanding of the *kind of* land involved. The Legislature did not intend it to mandate an inquiry into how a particular parcel of property is generally referred to in the community.

In *Kozak*, however, the Court of Appeals at least examined the common definitions of those words and noted that "[t]he testimony at trial from people who had been to the area of land in question all provided testimony that overwhelmingly described property meeting all three of these common definitions." *Id*. at 2-3.

the DEQ's principal investigator acknowledged that it was not readily apparent that a wetland was present on Taylor's property. As this case demonstrates, recognizing a potential violation of the wetlands protection act is both a complex and uncertain task. In the context of an administratively defined *malum prohibitum* offense that requires ordinary citizens to possess a heightened degree of technical skill to comprehend, the Legislature might wish to consider with particular care whether it intends that such offenses be treated by our judiciary as lacking any form of *mens rea* and thereby imposing strict liability.[9]

*Third*, while the Legislature did not itself define "contiguous," an administrative rule promulgated by the DEQ defines "contiguous" to mean "[a] seasonal or intermittent direct surface water connection to an inland lake or pond, a river or stream, one of the Great Lakes, or Lake St. Clair." Mich Admin Code, R 281.921(1)(b)(ii). This rule significantly broadens the scope of the wetlands protection act, specifically MCL 324.30301 and MCL 324.30304, to find the presence of a wetland not merely where the land is genuinely contiguous to a river or stream, i.e., sharing a common border or touching, but also where there is a "direct surface water connection." Moreover, the rule countenances that the "direct surface water connection" might be an artificially constructed one. Indeed, a "guidance" document issued by the DEQ further expounds that a "direct surface water connection" may include "surface water within pipes, culverts, ditches, and other man-made structures of any length." Department of Environmental Quality, Land & Water Management Division, Guidance Document No. 303-06-01, issued April 18, 2006, p 2. Cf. MCL 324.30311a.

It has been said that "[t]here is precious little difference between a secret law and a published regulation that cannot be understood." Lynch, Introduction to *In the Name of Justice: Leading Experts Reexamine the Classic Article "The Aims of the Criminal Law"* (Lynch ed) (Washington, DC: Cato Institute, 2009), p. xi. Many *malum prohibitum* offenses are defined in significant part by administrative rules and regulations. Vague regulations, amorphous definitions of the elements of the crime, and rules not altogether compatible with the provisions of the statute are distinguishing and continuingly problematic aspects of prosecutions of those administratively defined offenses. Again, as the United States Supreme Court has recognized:

> A criminal statute cannot rest upon an uncertain foundation. The crime, and the elements constituting it, must be so clearly expressed that the

---

[9] See, e.g., Gerger, *Environmental Crime*, 24 Champion 34, 36 (Oct 2000) (suggesting that in the context of environmental crimes, in which "the government prosecutes vague or complex regulations that ordinary people can easily misunderstand or even overlook, . . . it should have to prove that its targets understood the law and deliberately broke it").

> ordinary person can intelligently choose, in advance, what course it is lawful for him to pursue. Penal statutes prohibiting the doing of certain things, and providing a punishment for their violation, should not admit of such a double meaning that the citizen may act upon the one conception of its requirements and the courts upon another. [*Connally v Gen Constr Co*, 269 US 385, 393 (1926) (quotation marks and citation omitted).]

In the instant case, there was considerable confusion concerning the proper definition of the terms defining the substantive crime at issue, in particular the meaning of "contiguousness." The imprecise statute and administrative rule infused more confusion into an already complex area of law. It appears that both the parties and the district court itself experienced considerable difficulty in reconciling the words of the statutes with the words of the administrative rule to arrive at the proper understanding of "contiguous." When it is difficult for lawyers and judges to decipher the elements of the crime being prosecuted, it seems particularly problematic to adhere to the traditional maxim that the citizenry must be "presumed to know the law." See, e.g., *Mudge v Macomb Co*, 458 Mich 87, 109 n 22 (1998).

In drafting criminal statutes involving *malum prohibitum* administrative offenses, i.e., offenses that are not inherently wrongful such as homicide and theft but are wrongful only because they are prohibited by law, our Legislature might wish to take care in defining critical terms and elements with as much specificity as possible and in terms that are as accessible to ordinary citizens as possible so that they might readily understand what course of conduct it is lawful, and unlawful, to pursue. To the extent that this is not done, the terms and elements will come to be defined by administrative regulators, whose judgments in many instances may vary from those of the Legislature and in other instances may give rise to inconsistent obligations and duties on citizens by the effective enactment of a second law pertaining to the same subject matter. The applicability of administrative criminal offenses is not confined to large and sophisticated businesses, replete with their own legal counsel's office — as evidenced by the instant case; they apply equally to smaller enterprises, as well as to individuals and residential property owners. All who are subject to the criminal law should be able to assess with some measure of confidence whether they are at the risk of violating that law, and having to navigate among multiple bodies of law and choose between the terms of statutory Law A and regulatory Law B, as in a Chinese restaurant menu, renders this increasingly difficult.

*Fourth*, while the Legislature may grant administrative agencies the power to promulgate rules and regulations, it remains the constitutional province of the Legislature to legislate. See Const 1963, art 4, § 1 ("The legislative power of the State of Michigan is vested in a senate and a house of representatives."). By broadly defining regulatory offenses in vague terms, the Legislature relinquishes, or "delegates," to administrative agencies (if there are sufficient standards accompanying the charge) the authority to enact critical policies for this state, in particular policies determining who will be subject to the

sanctions of the criminal law.  One need not be a constitutional fundamentalist to question the propriety of unelected and unaccountable administrative officials undertaking such decisions by defining the terms and scope of laws whose violation will engender a loss of personal freedom.

The Legislature might take care to recognize that its mission and that of the administrative "branch" of government are institutionally distinct in ways that may practically affect the criminal laws that each enacts or promulgates.  The Legislature represents the whole of the people in the broadest possible manner, and the laws that it produces must pass muster by the support of at least a majority of legislators, representing constituencies that are urban, rural, and suburban; constituencies of every socioeconomic, racial, and ethnic composition; constituencies in which different businesses, interests, and political and partisan philosophies are reflected and balanced; and in which, however imperfectly, the "general welfare" standard is optimally realized.  By contrast, administrative agencies are often defined by a mission consisting of a "single purpose," as to which "special interests," in contrast to "we the people" as a whole, are particularly focused, and in which the kind of give-and-take, negotiation, and compromise reflected within the legislative process tend to be replaced by a more narrow and singled-minded process of rulemaking.  That is, the often "gray" decision-making of the Legislature, in which many points of view may prevail in some respect, is replaced by the "black-and-white" decision-making of regulators, in which "winners" and "losers" are more clearly demarcated.  Therefore, in delegating criminal lawmaking responsibility to an administrative agency, the Legislature delegates that responsibility to a body that may possess a very different sense of what constitutes prudent and responsible public policy.  If the Legislature is to maintain faith with its own broader constituency, it might wish to take care in recognizing these institutional differences and the varying incentives and disincentives that act on each body.

*Fifth*, the wetlands protection act provides the opportunity for either civil or criminal enforcement, and there are a number of discrete criminal offenses contemplated by the act.[10]  The decision concerning which of these sanctions to seek appears to be, for

---

[10] MCL 324.30316 provides:

(1) The attorney general may commence a civil action for appropriate relief, including injunctive relief upon request of the department under [MCL 324.30315(1)].  An action under this subsection may be brought in the circuit court for the county of Ingham or for a county in which the defendant is located, resides, or is doing business.  The court has jurisdiction to restrain the violation and to require compliance with this part.  In addition to any other relief granted under this section, the court may impose a civil fine of not more than $10,000.00 per day of violation.

the most part, left necessarily to the discretion of the agency and the prosecutor. Administratively defined *malum prohibitum* criminal offenses tend to consist of multiple provisions, and the enumeration of multiple potential offenses, that can be pursued at the heightened discretion of the agency and the prosecutor. Although that discretion is an inevitable part of a criminal justice process in which there are inadequate resources (as well as little inclination) to pursue every possible violation of the criminal law, no matter how inconsequential, the "equal rule of law" would not seem to be furthered by a criminal justice regime in which prosecutorial discretion is maximized, rather than constrained, and in which similarly situated criminal offenders are subject to potentially widely varying sanctions. Indeed, the legislative sentencing guidelines enacted in Michigan were designed precisely to address such disparities, although largely with respect to criminal offenses that are not administratively defined.

As such, the Legislature might wish to consider with care whether the unfettered discretion of agencies and prosecutors to select among multiple available punishments for the same criminal offense should be limited, just as the sentencing guidelines have already limited the discretion of judges to determine precise criminal sentences. The criminal consequences of a regulatory violation should not be an afterthought on the part of the Legislature in a regulatory enactment, and it cannot be an aspect of such a scheme left to an agency's determination; rather, it should be the subject of as much definition as more traditional criminal statutes. Furthermore, as the numbers of statutes criminalizing

---

A person who violates an order of the court is subject to a civil fine not to exceed $10,000.00 for each day of violation.

(2) A person who violates this part is guilty of a misdemeanor, punishable by a fine of not more than $2,500.00.

(3) A person who willfully or recklessly violates a condition or limitation in a permit issued by the department under this part, or a corporate officer who has knowledge of or is responsible for a violation, is guilty of a misdemeanor, punishable by a fine of not less than $2,500.00 nor more than $25,000.00 per day of violation, or by imprisonment for not more than 1 year, or both. A person who violates this section a second or subsequent time is guilty of a felony, punishable by a fine of not more than $50,000.00 for each day of violation, or by imprisonment for not more than 2 years, or both.

(4) In addition to the penalties provided under subsections (1), (2), and (3), the court may order a person who violates this part to restore as nearly as possible the wetland that was affected by the violation to its original condition immediately before the violation. The restoration may include the removal of fill material deposited in the wetland or the replacement of soil, sand, or minerals.

regulatory offenses increases, the discretion afforded agencies and prosecutors will inevitably be amplified, creating the risk that those statutes will be "enforced sporadically, either as a matter of deliberate policy to proceed only on a private complaint, or as a matter of the accident of what comes to official attention or is forced upon it." Hart, *The Aims of Criminal Law*, 23 Law & Contemp Probs 401, 429 (Summer 1958). In order to ensure that criminal prosecutions are reserved for those crimes most destructive of persons and property, and to ensure to the fullest extent possible that laws are administered fairly and uniformly, the Legislature might wish to consider standards articulating the range of circumstances under which an administratively defined *malum prohibitum* offense warrants the imposition of the most severe and the least severe available sanctions.[11]

As demonstrated by the instant case, the criminalization of regulatory conduct is troubling to the constitutional order. Unlike its federal counterpart, one of the distinguishing characteristics of state criminal law has been its overwhelming focus on crimes that are *malum in se*, traditional common-law crimes that have been incorporated into our criminal statutes, in which perpetrators have, to paraphrase one commentator, "hit other people, taken other people's stuff, or failed to keep their promises." See Boaz, *The Politics of Freedom* (Washington, DC: Cato Institute, 2008), pp xv-xvi. This Court's criminal docket consists largely of crimes that are clearly defined by the Legislature, contain well-understood elements and straightforward *mens rea* requirements, are reasonably well understood by ordinary persons, and typically enjoy a broad consensus of support across the citizenry. Although strict-liability and regulatory crimes are hardly unknown to the state system, their prosecution is far less common than

---

[11] In the view of at least one academic observer, it seems that one possible factor conducing in favor of an exercise of judgment to prosecute is that certain environmental cases "are unlikely to be prosecuted criminally unless there is a government perception that the offender ignored advice to obtain a permit or showed disrespect for authority[.]" Sharp, *Environmental Enforcement Excesses: Overcriminalization and Too Severe Punishment*, 21 Environ L Rep 10658, 10662 (1991). In these circumstances, "[c]riminal intent is derived almost wholly from the defiance of authority, and the defiance, not the environmental harm, dictates which cases involve criminal behavior." *Id*.

in the federal system, and the constitutional rules of the game are considerably less well developed.

While it is the obligation of this Court to give faithful meaning to *all* of our state's criminal laws, of whatever nature, and to presume their constitutionality, the proliferation of statutes such as the present act renders navigation of the legal system by citizens, lawyers, and judges increasingly difficult. In promulgating new statutes that criminalize regulatory offenses, our Legislature might wish to take the utmost care to ensure that such laws are accessible to the people and afford as much due process as reasonably possible in enabling their terms to be apprehended and their obligations to be understood.



I, Larry S. Royster, Clerk of the Michigan Supreme Court, certify that the foregoing is a true and complete copy of the order entered at the direction of the Court.

January 31, 2014



Clerk

t0128