J-A35018-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| ANDRE BRANCH SAMUELS, | |
| Appellant | No. 1426 WDA 2014 |

Appeal from the Judgment of Sentence July 30, 2014
In the Court of Common Pleas of Allegheny County
Criminal Division at No(s): CP-02-CR-0017274-2013

BEFORE:  BENDER, P.J.E., SHOGAN, and MUSMANNO, JJ.

MEMORANDUM BY SHOGAN, J.:                     **FILED JANUARY 25, 2016**

Appellant, Andre Branch Samuels, appeals from the July 30, 2014 judgment of sentence entered following his conviction at a bench trial of possession of a firearm with altered manufacturer's number, firearm not be carried without a license, and person not to possess a firearm.  Following our careful review, we affirm.

The trial court summarized the facts of the crimes as follows:

> On the evening of October 28, 2013, Officers [Gary] Messer, [Michael] Coleman, and [Santino] Achille of the City of Pittsburgh Police Department were patrolling Sandusky Court, a housing development located on the North Side of the City of Pittsburgh.  The officers were targeting this particular area because they had received, within the ten (10) days previous, "numerous citizen complaints from residents concerning large amounts of open air drug trafficking" taking place there, specifically around building 1634.  Sandusky Court was considered to be an "extremely high crime area," and Officer

Messer had made nearly fifty (50) arrests there for firearm and narcotics offenses within the last year alone.

At approximately 8:00 p.m. that evening, the officers entered Sandusky Court and drove towards building 1634. The officers were in an undercover vehicle and wore plainclothes instead of uniforms, but they had their badges displayed on their chests. As they pulled into the circle on which building 1634 is located, they observed a group of five (5) to seven (7) men standing in front of that building. Officer Messer, who was in the front passenger seat, recognized [Appellant] within the group. Officer Messer knew [Appellant] from a previous gun arrest that [Appellant] had within six (6) months to one (1) year prior. He also knew that [Appellant] did not reside in Sandusky Court, and he knew that [Appellant] lived in an area that was a five (5) minute drive away.

The officers drove into the circle, towards the group of men, but they did not stop or attempt to initiate any contact with anyone in the group. Upon seeing their vehicle approach, [Appellant] "appeared to quickly look side to side" and then "separated from the group." As the vehicle crested the turnaround of the circle, [Appellant] ran or quickly moved into building 1634. Officer Messer then observed [Appellant] turn around and take both hands to pull the door closed behind him. The officers were still in their vehicles when [Appellant] left the group and fled into the building. After they had turned around in the circle and were again in front of building 1634, Officer Messer observed [Appellant] peering out through a window on the second landing of building 1634. Although [Appellant] could only be seen from his neck up, Officer Messer was able to observe [Appellant] moving from "left to right repeatedly in a frantic manner" at least three (3) to four (4) times within a five (5) to ten (10) second span. Upon seeing this behavior, Officers Messer and Coleman exited their vehicle to investigate the situation because [Appellant] "just took off for no reason" and then appeared to be "trying the doors" of the apartments, a fact that the officers were able to surmise because they knew that there were units on the left and right side of the building and they didn't know what else he could have been doing.

Officers Messer and Coleman exited their vehicles and jogged into the building with their badges displayed. As the officers entered building 1634, they heard [Appellant] running

up the stairs to the third floor. The officers also were able to see [Appellant] running as they approached the second floor landing. The officers identified themselves as Pittsburgh Police and ordered [Appellant] to stop, which he failed to do. As Officer Messer continued running up the stairs, he observed [Appellant] enter Apartment 209 . . . and close the door behind him. When Officer Messer reached the third floor landing, he heard the door to that apartment lock. Officer Messer did not hear [Appellant] knock, bang or request that he be let into the apartment prior to his entry. The officers then heard arguing, yelling and screaming coming from inside of the apartment, at which time they knocked on the door repeatedly, identifying themselves as Pittsburgh police. Within a few seconds, Marie Murrell, the resident of the apartment, answered the door while still yelling and arguing with someone in her apartment. She told the officers that a man she did not know had forced his way into her apartment and that she wanted him out. Ms. Murrell quite clearly conveyed to the officers that [Appellant] was not wanted in her apartment and that she wanted him removed from her residence.

As Ms. Murrell opened the door wider, Officer Messer was able to see [Appellant] standing in her apartment. Officer Messer immediately noticed a "bulge" in [Appellant's] front jeans pocket. Based on Ms. Murrell's statements that [Appellant] was not authorized to be in her home, [Appellant] was then detained and handcuffed by Officer Coleman. Officer Coleman conducted a pat-down of [Appellant's] outer clothing and immediately recognized what he felt to be a firearm in [Appellant's] right pocket. Officer Coleman retrieved a firearm from [Appellant's] front right jeans pocket.

Trial Court Opinion, 2/27/15, at 4–7 (internal citations to the record omitted).

Appellant was charged with an eight-count information on October 28, 2013; five of the charges were withdrawn by the Commonwealth at the preliminary hearing. Appellant filed an *omnibus* pretrial motion on March 19, 2014, seeking the suppression of evidence. The trial court held a

hearing on the motion on April 22, 2014, and following the submission of briefs, denied the motion to suppress on July 25, 2014. Appellant waived a jury trial, and the trial court convicted Appellant of the described charges on July 30, 2014. Appellant waived a presentence report and was sentenced to eighteen to thirty-six months of imprisonment for possession of a firearm with altered manufacturer's number, with credit of six months for time served and a recommendation for boot camp, followed by a consecutive term of two years of probation.

Trial counsel filed a motion for leave to withdraw on August 1, 2014, which the trial court granted on August 5, 2014. The trial court appointed the public defender's office to represent Appellant, and new counsel filed a notice of appeal on August 29, 2014. Both Appellant and the trial court complied with Pa.R.A.P. 1925.

Appellant raises the following two issues on appeal:

I. Whether the trial court erred in failing to grant suppression of the gun because, as soon as the police officers identified themselves as law enforcement and ordered [Appellant] to stop, he was seized as a matter of law but, at the precise moment of seizure, the police officers did not have reasonable suspicion, based on specific and articulable facts, to believe that [Appellant] was engaged in criminal activity?

II. Whether the evidence was insufficient to convict [Appellant] of Possession of Firearm With Altered Manufacturer's Number because this [is] not a strict liability crime but, rather, has a *mens rea* requirement, and the Commonwealth failed to prove, beyond a reasonable doubt, that [Appellant] acted with the requisite guilty knowledge or criminal intent?

- 4 -

Appellant's Brief at 6.

When an appellant raises both a sufficiency-of-the-evidence issue and a suppression issue, we address the sufficiency of the evidence supporting the conviction first, and we do so without a diminished record:

> We are called upon to consider all of the testimony that was presented to the jury during the trial, without consideration as to the **admissibility of that evidence**. The question of sufficiency is not assessed upon a diminished record. Where improperly admitted evidence has been allowed to be considered by the jury, its subsequent deletion does not justify a finding of insufficient evidence. The remedy in such a case is the grant of a new trial.

*Commonwealth v. Stanford*, 863 A.2d 428, 431–432 (Pa. 2004) (emphasis in original). Thus, we address Appellant's issues in reverse order and begin by addressing the sufficiency of the evidence, as "[t]he Double Jeopardy Clause bars retrial after a defendant's conviction has been overturned because of insufficient evidence." *Commonwealth v. Mullins*, 918 A.2d 82, 85 (Pa. 2007) (citations omitted).

In reviewing a sufficiency challenge, "we must decide whether the evidence admitted at trial, and all reasonable inferences drawn therefrom in favor of the Commonwealth, as verdict winner," are sufficient to support all elements of the offense. *Commonwealth v. Hitcho*, 123 A.3d 731, 746 (Pa. 2015). The trial court, sitting as the finder of fact, is free to believe some, all, or none of the evidence. *Commonwealth v. Cousar*, 928 A.2d 1025 (Pa. 2007); *Commonwealth v. Tejada*, 107 A.3d 788, 792–793 (Pa.

Super. 2015). Moreover, the Commonwealth may sustain its burden of proof by wholly circumstantial evidence. **Commonwealth v. Diggs**, 949 A.2d 873 (Pa. 2008); **Commonwealth v. Vogelsong**, 90 A.3d 717 (Pa. Super. 2014), *appeal denied*, 102 A.3d 985 (Pa. 2014). As an appellate court, we may not re-weigh the evidence and substitute our judgment for that of the fact-finder. **Commonwealth v. Rogal**, 120 A.3d 994 (Pa. Super. 2015).

Appellant asserts that the evidence was insufficient to convict him of possession of a firearm with an altered manufacturer's number. The relevant statute provides as follows:

> **(a) General rule.--**No person shall possess a firearm which has had the manufacturer's number integral to the frame or receiver altered, changed, removed or obliterated.

18 Pa.C.S. § 6110.2(a). "Where a case involves the proper construction of a statute, our standard of review is *de novo* and our scope of review is plenary." **Commonwealth v. T.J.W.**, 114 A.3d 1098, 1103 (Pa. Super. 2015) (citing **Octave ex rel. Octave v. Walker**, 103 A.3d 1255, 1259 (Pa. 2014)).

Appellant avers that the crime has a *mens rea* requirement, although he acknowledges that section 6110.2(a) "does not express a *mens rea* element." Appellant's Brief at 44. Rather, he posits that he was prosecuted and convicted as though this firearm offense is a strict liability crime. He contends there was insufficient evidence presented to prove beyond a

reasonable doubt that he acted with the requisite guilty knowledge or criminal intent. *Id*. at 49.

The Commonwealth submits that there is no *mens rea* requirement in 18 Pa.C.S. § 6110.2(a). Rather, it maintains that it was required to prove only that Appellant possessed a firearm, which had an altered, changed, removed, or obliterated manufacturer's number, and it did so. Commonwealth's Brief at 31.

The United States Supreme Court has repeatedly held that omission of any mention of criminal intent from a criminal statute should not be read as dispensing with it. *Morissette v. United States*, 342 U.S. 246, 250 (1952). Indeed:

> [t]his rule of construction reflects the basic principle that "wrongdoing must be conscious to be criminal." [*Morissette*,] at 252, 72 S.Ct. 240. As Justice Jackson explained, this principle is "as universal and persistent in mature systems of law as belief in freedom of the human will and a consequent ability and duty of the normal individual to choose between good and evil." *Id*., at 250, 72 S.Ct. 240. The "central thought" is that a defendant must be "blameworthy in mind" before he can be found guilty, a concept courts have expressed over time through various terms such as *mens rea*, scienter, malice aforethought, guilty knowledge, and the like. *Id*., at 252, 72 S.Ct. 240; 1 W. LaFave, Substantive Criminal Law § 5.1, pp. 332–333 (2d ed. 2003). Although there are exceptions, the "general rule" is that a guilty mind is "a necessary element in the indictment and proof of every crime." *United States v. Balint*, 258 U.S. 250, 251, 42 S.Ct. 301, 66 L.Ed. 604 (1922). We therefore generally "interpret criminal statutes to include broadly applicable scienter requirements, even where the statute by its terms does not contain them." *United States v. X–Citement Video, Inc.*, 513 U.S. 64, 70, 115 S.Ct. 464, 130 L.Ed.2d 372 (1994).

*Elonis v. United States*, ___ U.S. ___, 135 S.Ct. 2001, 2009 (2015). Our

state law parallels these precepts. This Court recently reitereated:

> Although the statute does not contain an express culpability requirement, this does not mean the legislature intended to dispense with the element of criminal intent. ***See Commonwealth v. Gallagher***, 592 Pa. 262, 924 A.2d 636, 638–39 (2007) (mere absence of express *mens rea* requirement in statutory crime is not indicative of legislative intent to impose strict liability (citations omitted)). Rather, "there is a long-standing tradition, which is reflected in the plain language of § 302, that criminal liability is not to be imposed absent some level of culpability." ***Id***. at 639.

***Commonwealth v. Giordano***, 121 A.3d 998, 1005 (Pa. Super. 2015)

(quoting ***Commonwealth v. Moran***, 104 A.3d 1136, 1149 (Pa. 2014)).

Appellant argued at trial and maintains on appeal that the

Commonwealth was required to prove that he "had some knowledge that the

serial number was obliterated." Appellant's Brief at 42; N.T., 7/30/14, at

12. We hearken back to *Elonis*, where the High Court stated:

> This is not to say that a defendant must know that his conduct is illegal before he may be found guilty. The familiar maxim "ignorance of the law is no excuse" typically holds true. Instead, our cases have explained that a defendant generally must "know the facts that make his conduct fit the definition of the offense," ***Staples v. United States***, 511 U.S. 600, 608, n. 3, 114 S.Ct. 1793, 128 L.Ed.2d 608 (1994), even if he does not know that those facts give rise to a crime.

*Elonis*, 135 S.Ct. at 2009.

The trial court held that the statute clearly lacks an intent

requirement. The court cited the laboratory report entered into evidence at

trial that the firearm was in good working condition and that the serial

number had been obliterated from the pistol's frame. Trial Court Opinion, 2/27/15, at 19. The trial court stated that the gun was concealed in Appellant's front pocket, "and the circumstantial evidence was sufficient to prove that [Appellant] was at least reckless in possessing a firearm with an altered manufacturer's number." *Id*. at 20.

Section 6110.2 does not specify the degree of culpability, or *mens rea*, required to sustain a conviction. Section 302 of the Crimes Code, however, provides the following guidance:

> **Culpability required unless otherwise provided.--**When the culpability sufficient to establish a material element of an offense is not prescribed by law, such element is established if a person acts intentionally, knowingly *or* recklessly with respect thereto.

18 Pa.C.S. § 302(c) (emphasis added). Intentionally, knowingly, and recklessly, in turn, are defined as follows:

> **(b) Kinds of culpability defined.--**
>
> > (1) A person acts intentionally with respect to a material element of an offense when:
> >
> > > (i) if the element involves the nature of his conduct or a result thereof, it is his conscious object to engage in conduct of that nature or to cause such a result; and
> > >
> > > (ii) if the element involves the attendant circumstances, he is aware of the existence of such circumstances or he believes or hopes that they exist.
> >
> > (2) A person acts knowingly with respect to a material element of an offense when:

(i) if the element involves the nature of his conduct or the attendant circumstances, he is aware that his conduct is of that nature or that such circumstances exist; and

(ii) if the element involves a result of his conduct, he is aware that it is practically certain that his conduct will cause such a result.

(3) A person acts recklessly with respect to a material element of an offense when he consciously disregards a substantial and unjustifiable risk that the material element exists or will result from his conduct. The risk must be of such a nature and degree that, considering the nature and intent of the actor's conduct and the circumstances known to him, its disregard involves a gross deviation from the standard of conduct that a reasonable person would observe in the actor's situation.

18 Pa.C.S. § 302(b)(1–3).

We find that the evidence was sufficient. The Crimes Code required the Commonwealth to establish culpability to sustain a conviction for possession of a firearm with an altered, changed, removed, or obliterated manufacturer's number. 18 Pa.C.S. § 6110.2. The Crimes Code also required that the Commonwealth demonstrate that Appellant acted intentionally, knowingly, **or**[1] recklessly with respect to the altered manufacturer's number on the firearm. Here, the testimony from the

---

[1] The word "or" is given its normal disjunctive meaning unless it produces an unreasonable result. ***Commonwealth v. Lopez***, 663 A.2d 746 (Pa. Super. 1995); 1 Pa.C.S. § 1903(a). Thus, the Commonwealth had to show that Appellant's actions were either intentional, knowing, **or** reckless.

suppression hearing was incorporated at trial. N.T., 7/30/14, at 9. That testimony by Officers Messer and Coleman established that Appellant ran from police and refused to stop upon direction to do so. N.T., 4/22/14, at 13, 29. Appellant continued to run from police after he fled into an apartment building and entered a third party's apartment against her will. *Id*. at 13–16. In the ensuing pat-down, police detected a firearm concealed in Appellant's right front jeans pocket. N.T., 4/22/14, at 45–46, 57–58. At trial, the Commonwealth admitted, without objection by Appellant, the laboratory report confirming that the serial number, in fact, had been obliterated from the frame of the gun.[2] N.T., 7/30/14, at 9. As noted by the trial court, the inferences from these facts established that Appellant illegally secreted a weapon with an obliterated manufacturer's number in his pants pocket. Thus, we agree that Appellant was "at least reckless" in possessing a firearm with an altered manufacturer's number. Trial Court Opinion, 2/27/15, at 20. Therefore, we find the evidence sufficient to sustain the conviction.

Appellant's second issue asserts that the trial court erred in failing to grant suppression of the gun.

> In evaluating a suppression ruling, we consider the evidence of
> the Commonwealth, as the prevailing party below, and any

_____

[2] The laboratory report also indicated that serial number grinding restoration techniques revealed the original serial number. N.T., 7/30/14, at 9.

> evidence of the defendant that is uncontradicted when examined in the context of the record. *Commonwealth v. Sanders*, 42 A.3d 325, 330 (Pa. Super. 2012). This Court is bound by the factual findings of the suppression court where the record supports those findings and may only reverse when the legal conclusions drawn from those facts are in error. *Id*.

*Commonwealth v. Haynes*, 116 A.3d 640, 644 (Pa. Super. 2015). Moreover, our Supreme Court in *In re L.G.*, 79 A.3d 1073 (Pa. 2013), clarified that the scope of review of orders granting or denying motions to suppress is limited to the evidence presented at the suppression hearing. Here, the suppression hearing post-dates the filing date of *L.G.*, which was held to be prospective; thus, *L.G.* applies to this case. *Commonwealth v. Caple*, 121 A.3d 511, 517 n.1 (Pa. Super. 2015).

Appellant maintains that as soon as police officers identified themselves as law enforcement and ordered Appellant to stop, he was seized as a matter of law. Appellant's Brief at 22. He contends police did not have reasonable suspicion to stop him because they lacked specific and articulable facts to believe that he was engaged in criminal activity. *Id*. at 23. Further, Appellant contends that a number of the trial court's factual findings are not supported by the record. First, he challenges the trial court's statement that the building Appellant subsequently entered was the very building that the police officers were investigating for drug activity. Appellant's Brief at 27. Instead, Appellant avers that Officer Messer testified that although the housing project of Sandusky Court was the subject of his investigation, his commander "never specified a particular building." Appellant's Brief at 27.

Second, Appellant refers to the trial court's claim that Appellant "ran into the building after leaving his companions." Appellant's Brief at 27 (citing Trial Court Opinion, 2/27/15, at 12). Rather, he suggests this is belied by Officer Messer's testimony. Appellant's Brief at 27–28 (citing N.T., 4/22/14, at 29).

Third, Appellant challenges the trial court's finding that Appellant separated himself from his companions and quickly entered the apartment building in response to police presence in the area. Appellant's Brief at 28. Instead, Appellant cites cases that he alleges support his claim that where the incident was at night, police were in plain clothes in an unmarked car, without sirens or lights, and in a high crime area, a seizure is not supported by reasonable suspicion of criminal activity. Appellant's Brief at 28–29.

The Commonwealth maintains that it is well settled that a police officer's observation of an individual in a high crime area, coupled with that person's flight upon observing the officer, combine to establish reasonable suspicion that criminal activity is afoot. Commonwealth's Brief at 17–18. In addition, the Commonwealth points out that Appellant failed to acknowledge that Officer Messer testified at the suppression hearing that he yelled, "Pittsburgh Police, stop!" but Appellant continued to run away. *Id*. at 15. Moreover, the Commonwealth disagreed that whether police had reasonable suspicion of criminal activity at the moment they yelled "stop" is not the critical issue, as suggested by Appellant. *Id*. at 17; Appellant's Brief at 23.

The Commonwealth contends that even before Officer Messer knocked on the door to Apartment 209, he heard yelling inside and confirmed that Appellant had forced his way inside; thus, police had probable cause to believe that Appellant had committed an unlawful entry. Commonwealth's Brief at 20. The Commonwealth asserts that Appellant's motion to suppress the firearm recovered during the pat-down search following his arrest was properly denied, regardless of whether it constituted an illegal seizure for Officer Messer to identify himself as a police officer and order Appellant to stop as Appellant ran up the internal stairs of the building. *Id*. at 21. Thus, the Commonwealth avers that the motion to suppress was properly denied, albeit on a basis other than that found by the suppression court. Alternatively, the Commonwealth alleges that the suppression court properly concluded that the police action did not constitute an illegal seizure.

The trial court held that there was no evidence in the record to support a finding that Appellant "was seized at any moment prior to the time that the officers ordered him to stop in the stairwell of the building." Trial Court Opinion, 2/27/15, at 11. The court found that the officers did not exit their vehicle until observing Appellant "behaving suspiciously in the window of the second landing of the building." *Id*. The trial court stated, "[T]here was absolutely no interaction between [Appellant] and the officers until the moment Officers Messer and Coleman entered the building and yelled 'Pittsburgh Police, stop' in the stairwell." *Id*. Thus, it rejected Appellant's

claim that he was pursued at any point prior to when he entered the stairwell.

As to Appellant's assertion that he was unlawfully seized because police had no justification to stop him, the trial court stated that under the totality of the circumstances, police had reasonable suspicion to stop him. In support, the trial court cited the following: 1) Appellant was in an extremely high crime area, 2) he stood in front of the very building that was the subject of numerous recent drug-trafficking complaints from residents, 3) Officer Messer immediately recognized Appellant as having had a recent gun arrest, 4) the officer knew Appellant did not reside in Sandusky Court, 5) Appellant was the only person in the group to act nervously and separate himself, and 6) Appellant ran or moved quickly into the building. Trial Court Opinion, 2/27/15, at 12.

The trial court stated that while there may not have been direct evidence that Appellant recognized the undercover vehicle as a police vehicle, "the totality of the circumstances, as well as the reasonable inferences drawn from the evidence, strongly demonstrate" that Appellant was aware that the vehicle was occupied by police. Trial Court Opinion, 2/27/15, at 13. The trial court held that police did not have a mere "hunch" that criminal activity was afoot; rather, they had specific and articulable facts. *Id*. at 14. In the alternative, assuming arguendo that Appellant was subjected to an unlawful frisk, the trial court held that "at the point when

- 15 -

[Appellant] was frisked and the firearm recovered, the officers had probable cause to arrest [Appellant] for criminal trespass, if not burglary, and the gun inevitably would have been discovered . . . ." Trial Court Opinion, 2/27/15, at 15.

Interactions between citizens and police officers in the realm of search and seizure law require different levels of justification "depending upon the nature of the interaction and whether or not the citizen is detained." ***Commonwealth v. DeHart***, 745 A.2d 633, 636 (Pa. Super. 2000). The three levels of interaction are: mere encounter, investigative detention, and custodial detention. ***Id***.

> A mere encounter can be any formal or informal interaction between an officer and a citizen, but will normally be an inquiry by the officer of a citizen. The hallmark of this interaction is that it carries no official compulsion to stop or respond.
>
> In contrast, an investigative detention, by implication, carries an official compulsion to stop and respond, but the detention is temporary, unless it results in the formation of probable cause for arrest, and does not possess the coercive conditions consistent with a formal arrest. Since this interaction has elements of official compulsion it requires reasonable suspicion of unlawful activity. In further contrast, a custodial detention occurs when the nature, duration and conditions of an investigative detention become so coercive as to be, practically speaking, the functional equivalent of an arrest.

[***Dehart***] (internal citations and quotation marks omitted).

> Reasonable suspicion exists only where the officer is able to articulate specific observations which, in

- 16 -

conjunction with reasonable inferences derived from those observations, led him reasonably to conclude, in light of his experience, that criminal activity was afoot and that the person he stopped was involved in that activity. Therefore, this Court must make an objective inquiry, namely, whether the facts available to the officer at the moment of the intrusion warrant a man of reasonable caution in the belief that the action taken was appropriate.

*Commonwealth v. Plante*, 914 A.2d 916, 922 (Pa. Super. 2006) (internal citations and quotations omitted).

"To determine whether a mere encounter rises to the level of an investigatory detention, we must discern whether, as a matter of law, the police conducted a seizure of the person involved." *Commonwealth v. Reppert*, 814 A.2d 1196, 1201 (Pa. Super. 2002).

To decide whether a seizure has occurred, a court must consider all the circumstances surrounding the encounter to determine whether the demeanor and conduct of the police would have communicated to a reasonable person that he or she was not free to decline the officer's request or otherwise terminate the encounter. Thus, the focal point of our inquiry must be whether, considering the circumstances surrounding the incident, a reasonable [person] innocent of any crime, would have thought he was being restrained had he been in the defendant's shoes.

*Id*. at 1201-1202 (internal citations and quotations omitted).

*Commonwealth v. Tam Thanh Nguyen*, 116 A.3d 657, 664–665 (Pa. Super. 2015).

We conclude that the trial court properly denied Appellant's motion to suppress. In assessing whether an officer had reasonable suspicion to justify an investigatory detention, we must consider the totality of the

circumstances. *Commonwealth v. Walls*, 53 A.3d 889, 893 (Pa. Super. 2012). While mere flight is not enough to constitute reasonable suspicion, *Commonwealth v. Martinez*, 588 A.2d 513, 514 (Pa. Super. 1991), fleeing from an officer may constitute the basis for reasonable suspicion in certain instances, as a "combination of innocent facts, when taken together, may warrant further investigation by the police officer." *Commonwealth v. Carter*, 105 A.3d 765, 772 (Pa. Super. 2014). Additionally, the court must afford weight to an officer's perception of the circumstances in light of the officer's experience. *Id*. at 773.

In *Illinois v. Wardlow*, 528 U.S. 119 (2000), the United States Supreme Court held that a police officer is justified in reasonably suspecting that an individual is involved in criminal activity when that individual: (1) is present in a high crime area, as here, and (2) engages in unprovoked, headlong flight after noticing the police. *Id*. at 124–125.[3] Accordingly, based upon the foregoing, we reject Appellant's claim that the suppression court erred by denying his motion to suppress. The totality of the

---

[3] In *Wardlow*, a four-car police caravan was investigating drug activity in an area of Chicago known for heavy narcotics trafficking. *Wardlow*, 528 U.S. at 121. One of the officers observed the defendant holding an opaque bag but none of the officers observed any specific indications that the defendant was in possession of contraband. When the defendant saw the police, he immediately fled. *Id*. at 122. The police apprehended him and during a pat-down search for weapons, recovered a gun. The Supreme Court affirmed the denial of the defendant's motion to suppress, reversing the decisions to the contrary by the Illinois courts. *Id*. at 122–124.

circumstances demonstrates that the police officers, in fact, had reasonable suspicion to believe that Appellant was engaged in criminal activity when they began their pursuit of him following his flight in a high crime area. *Id*. At the time Appellant fled into the apartment, Officer Messer knew Appellant did not live in the area and testified that he believed Appellant was attempting to enter other apartments before entering Apartment 209. N.T., 4/22/14, at 11–12.

Pittsburgh Police Officer Messer testified that at approximately 8:00 p.m. on October 28, 2013, he and his two partners were patrolling Sandusky Court because police had received numerous complaints from residents within the preceding ten days that open-air drug trafficking was taking place in the area, specifically in front of building 1634. N.T., 4/22/14, at 4-5, 21-24, 31. As they entered Sandusky Court in their unmarked vehicle,[4] Officer Messer observed a group of five to seven men, including Appellant, standing in front of building 1634. *Id*. at 5–7, 20, 26–27, 51. Officer Messer testified that he had previous dealings with Appellant and knew that he had a prior firearm arrest and did not live on Sandusky Court; rather, Appellant resided in the Marshall-Shadeland area of Pittsburgh, which was five minutes away. *Id*. at 5, 26–27, 37, 50–51. As the officers drove by at a slow speed,

_____

[4] Officer Messer admitted that the black Chevy Impala lacked police decals or markings, but he explained that given its regular presence in the area, many residents in the community were aware that it was a police car. N.T., 4/22/14, at 6, 21, 24–25.

Appellant looked quickly from side to side upon noticing the car and then separated himself from the other males in the group. *Id*. at 5–6, 21, 27, 29, 51. He then ran into building 1634 and closed the door behind him. *Id*. at 6–8, 29. Officer Messer testified that he could see Appellant on the second-floor landing through the window above the front door, moving "from left to right repeatedly in a frantic manner." *Id*. at 9-12, 31, 36–37. Appellant was peering out of the window at police. *Id*. at 8–10.

Officers Messer and Coleman exited their vehicle and upon seeing Appellant fleeing up the stairs yelled, "Pittsburgh Police, stop!" N.T., 4/22/14, at 12, 37, 39–41. Instead, Appellant entered Apartment 209 and locked it, and police heard yelling from inside the apartment. *Id*. at 13, 52. When police knocked on the door, it was opened by Marie Murrell, who was screaming at Appellant to leave her apartment. *Id*. at 42. Officer Messer observed a bulge in Appellant's right jeans pocket, and "based on [the officer's] training and experience from previous firearms arrests," he believed the bulge was a firearm. *Id*. at 46.

Thus, in the alternative, even if Officer Messer did not have reasonable suspicion to believe that Appellant was engaged in criminal activity at the time the officer entered building 1634 and ordered Appellant to stop, Appellant's subsequent actions of unlawfully entering an apartment gave Officer Messer probable cause to arrest Appellant, at the very least, for

criminal trespass.[5]   Our Supreme Court's analysis in **Commonwealth v. Jackson**, 924 A.2d 618 (Pa. 2007), is instructive.   In **Jackson**, a police officer approached the defendant on suspicion that he was gambling, in violation of the city code.   **Id**. at 619.   The defendant fled, despite the officer's order to stop, and the officer pursued him.   **Id**.   When the officer caught up with him, the defendant assaulted the officer, and the defendant fled a second time.   **Id**. at 620.   While the Supreme Court determined that the initial pursuit by the police officer was not lawful, it reasoned that where a suspect commits a crime in the course of fleeing from an unlawful arrest, the pursuing officer has probable cause for an arrest for that crime:

> The initial illegality does not give the arrestee a free pass to commit new offenses without responsibility.   Neither does that initial illegality "poison the tree," preventing lawful police conduct thereafter—the new crimes are new trees, planted by [the arrestee], and the fruit that grows from them is not automatically tainted by the initial lack of probable cause.

**Id**. at 621.   For all of these reasons, we conclude the trial court properly denied Appellant's motion to suppress.

Judgment of sentence affirmed.

_____

[5]   Officer Messer testified that Appellant was going to be placed under arrest regardless of the presence of the gun in his pocket, due to his actions of forcing his way into Ms. Murrell's apartment and locking the door.   N.T., 4/22/14, at 19, 54.   Indeed, Appellant initially was charged, *inter alia*, with burglary.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: <u>1/25/2016</u>